The State v. Cadwell.

---

### THE STATE v. CADWELL *et al.*

1 **Fraudulent Banking:** INDICTMENT AND PROOF: AGENCY. An indictment charging defendants with fraudulent banking, in that they received a certain deposit at a stated time and place, when they were insolvent, is sustained by proof that their cashier received the deposit as their agent; the rule applying that what one does by his agent he does himself.

2. ———: "DEPOSIT" DEFINED. Such indictment is sustained by proof of the receipt of money upon a certificate of deposit,—the transaction in such case being as truly a "deposit," within the meaning of the statute, as is an ordinary call deposit.

3. ———: INSOLVENCY : EVIDENCE. As tending in some degree to prove the insolvency of the bank at the time of accepting the deposit, it was competent to introduce an assignment for the benefit of creditors, made by defendants five months after the date of the deposit.

4. The Same : OPINIONS OF EXPERT ACCOUNTANTS. In such case, an expert accountant, who has examined the books of the bank with reference to its solvency at different times, may, in connection with the *data* upon which his opinion is founded, testify as to his opinion concerning the solvency or insolvency of the bank.

5. The Same : VALUE OF DEFENDANTS' HOMESTEADS. In such case, where the defendants had made an assignment which did not include their homesteads, *held* that evidence of the value of such homesteads was not admissible to show that they were solvent.

6. The Same : OPINIONS OF EXPERT ACCOUNTANTS : BEST EVIDENCE. While the books of the bank in such a case are the best evidence of what they show as to the solvency of the bank, yet it is proper to aid the jury in determining what they show, by accompanying them with the opinions of expert witnesses who have examined them with reference to the point in question.

7. The Same : TWO BANKS OWNED BY INDICTED FIRM. Where defendants were indicted as a firm, and the firm owned two banks in the same county, in one of which the deposit was received, it was competent to inquire into the solvency of both banks for the purpose of ascertaining whether the firm was insolvent at the time of receiving the deposit.

8. Fraudulent Banking : INSTRUCTION AS TO FORM OF CRIME NOT CHARGED. Upon an indictment of the owners of a bank for receiving a deposit when they were insolvent, the court, in its instructions, quoted the statute under which the indictment was found, including language which made it a crime to "be accessory, or permit, or connive at, the receiving or accepting on deposit," etc. *Held* that this was not submitting to the jury an issue as to a form of the crime not charged in the indictment, since the whole charge made it clear that defendants were accused only of themselves receiving the deposit in question.

9. ———: INSTRUCTIONS AS TO KNOWLEDGE. In such case, where the deposit was in fact received by defendants' cashier, it was sufficient, on the point of defendants' knowledge, to instruct that the deposit must have been received on their authority, and that they must have received it knowing of their insolvency.

10. ———: INSOLVENCY : WHAT CONSTITUTES. A firm engaged in bank-
ing is insolvent, within the meaning of chapter 153, Laws of 1880,
making it a crime for bankers to receive deposits knowing of their
insolvency, when it is unable to meet its liabilities as they become
due in the ordinary course of business; and bankers who receive
deposits, knowing themselves to be thus insolvent, cannot escape
the penalty of the law on the ground that they believe that, with
time and indulgence, they can settle all demands. (See opinion
for a discussion of the term "insolvency" upon the authorities.)

*Appeal from Harrison District Court.*—HON. GEORGE
W. WAKEFIELD, Judge.

FILED, FEBRUARY 7, 1890.

INDICTMENT for fraudulent banking. From a judg-
ment against defendants, they appeal.

*L. R. Bolter & Sons* and *J. W. Barnhart*, for
appellants.

*John Y. Stone*, Attorney General, for the State.

GRANGER, J.—The defendants are indicted under
chapter 153 of the Laws of the Eighteenth General
Assembly, which provides "that no bank, banking
house, exchange broker, deposit office, or firm, com-
pany, corporation or party engaged in banking, broker,
exchange or deposit business shall accept or receive on
deposit * * * any moneys, bank bills or notes, or
United States treasury notes or currency, or other notes,
bills or drafts circulating as money or currency,
when such bank, or banking house, exchange broker or
deposit office, firm or party is insolvent," and that "if
any such bank, banking house, exchange broker or
deposit office, firm, company, corporation or party,
shall receive, or accept on deposit, any such deposits,
as aforesaid, when insolvent, any officer, director,
cashier, manager, member, party or managing party
thereof, knowing of such insolvency, who shall know-
ingly receive or accept * * * any such deposits as
aforesaid, shall be guilty of a felony, and upon convic-
tion shall be punished" as therein provided. The

indictment in this case was returned about November 10, 1888. For some years prior thereto, the defendants had owned and managed two banks,—one known as "Cadwell's Bank," at Logan, and the other known as "Boyer Valley Bank," at Woodbine,—both in Harrison county. The indictment charges that on the seventeenth day of May, 1888, the defendants, as such bankers, were insolvent, and on that day they accepted and received from Mary E. Oliver, on deposit, one hundred and ten dollars. On the ninth day of October, 1888, the defendants, under the provisions of the statute, made a general assignment for the benefit of their creditors, and Stephen King was made their assignee. The record presents a number of questions which we will consider in their order.

I. At the time the deposit in question was received, one John X. Aleck was cashier of defendants' bank

1. FRAUDU- at Logan, and issued the certificate; and
LENT bank- at the time neither of the defendants was
ing: indict-
ment and present. The certificate, against the objec-
proof:
agency. tion of the defendants, was admitted in evidence, and the ruling is made a ground of complaint here. A specific ground of complaint in argument is that the defendants were indicted for receiving the deposit, and it is not competent to show on the trial that the money was received by another than the defendants personally. We think no such rule has ever been held by a court of last resort. On the contrary, a general and well-recognized rule is that, if a person does the act constituting the offense, through the agency of another, the act is his, and it is unnecessary to aver the agency in the indictment. It may be charged directly as his act, and proof that he did the act through the agency of another will sustain a conviction. Whart. Crim. Ev. [9 Ed.] secs. 102, 112 ; Whart. Crim. Law [9 Ed.] sec. 522 ; *State v. Neal,* 7 Fost. (N. H.) 131; *Commonwealth v. Nichols,* 10 Metc. 259; *Commonwealth v. Bagley,* 7 Pick. 279 ; *Stoughton v. State,* 2 Ohio St. 562 ; *Brister v. State,* 26

Ala. 107. It is further said, in this connection, that the defendants are not charged with permitting or conniving at the receiving of the deposit, but with receiving it themselves, and that, under the averments of the indictment, the proofs as to Aleck's receiving the money are not admissible. The rule above announced is conclusive of this question. The defendants are indicted as a firm of bankers, and as such they are charged with receiving the money; and it is entirely immaterial whether they received it in person, or through their cashier. In law, if they permitted him to do it for them, they did it themselves.

Our attention is directed to Code, section 4298, to the effect that the indictment must be direct and certain as to the particular circumstances of the offense charged, when necessary to constitute a complete offense. The indictment in this case charges that the defendants, as such bankers, did, at a certain time and place, being then insolvent, receive the deposit in question. That is certainly a statement of the facts constituting the offense, in ordinary and concise language, and in such manner as to enable a person of common understanding to know what is intended. Such alone is the requirement of the law. Code, sec. 4296. Under such averments, the state may prove that they received the deposits through the cashier of their bank.

Another point urged as against the admission of the certificate of deposit in evidence is that on its face it is evidence of money loaned, instead of a deposit, that the indictment charges the offense as receiving, and the law only makes it an offense to receive money on deposit. The certificate is as follows:

2. ——: "deposit" defined.

"$110.    CADWELL'S BANK, LOGAN, IA., May 17, 1888.

"This certifies that Mrs. Mary E. Oliver has deposited in this bank one hundred and ten dollars, payable to the order of self, in current funds, on the return of this certificate properly indorsed. No. 2142.

"JOHN X. ALECK, Cashier."

It is true the transaction is, in a certain sense, a loan of money, but not in a sense to distinguish it from the deposit contemplated in the law. In banking circles, deposits are often qualified or distinguished as "time" and "call" deposits. The former is for a specified time, and the latter is subject to call at the pleasure of the depositor. In fixing the character of the transaction, we look to the intent of the act, making the receipt of deposits by an insolvent bank a crime. In some measure, we judge of that intent by looking to the evil to be remedied by it. It is a matter of common observation that deposits are made, in banks, upon an entirely different reliance as to security than in the investment of money as a "loan," as the term is generally understood. Banks, in receiving deposits, offer no security, nor is security expected. The money is thus placed in a bank because of a confidence in its solvency and ability to repay, because of the fact that it is a bank ; and this confidence continues, even in the face of the fact that it is so often misplaced. In the case of ordinary loans, the question of the solvency of the borrower, and the safety of the investment, is made a matter of prior investigation ; and in many sections of the country a pledge of property as security is generally required. In making these deposits with banks without security, people make no distinctions in the character of the deposits ; that is, whether they are "time" or "call" deposits. They are made with the same confidence in the solvency of the bank, and upon like terms as to security. The repeated instances in which this confidence has been betrayed, and depositors subjected to loss, led to the legislation referred to. Under the present law, no insolvent bank has the right to receive money on deposit. It is fair to presume that the legislature used the term "deposit" as it is ordinarily used in banking and commercial circles, and we see no reason for thinking the law designed a protection for the people against loss by one class of deposits, and not the other. The certificate designates the transaction

as a "deposit," and we think it clearly within the purview of the legislative purpose.

II. The deed of assignment was admitted in evidence, of which complaint is made. A claim especially urged in this respect is as to the difference in time between the deposit, May 17, 1888, and the assignment, October 7, 1888. In this there was no error. Such assignments are made because of solvency, actual or contemplated. The deed of assignment tended to prove insolvency at the time it was made, which, it is true, was nearly five months after the deposit; but, if it alone, or with other evidence, established the fact of insolvency at that time, that fact might be an aid in determining the true condition of the bank in May, by showing what changes had taken place in the property affairs of the firm in the meantime. To plainly illustrate, let it appear from other evidence that no change had taken place. Then, of course, there was insolvency in May. If changes, then what were they? And the fact is a question for the jury. It is true, as said in argument, that one may be free from debt in May, and hopelessly involved in October; but the October condition of the bank is not allowed to define or control that of May. It is only a link in the chain that establishes the ultimate fact.

*3. ——: insolvency: evidence.*

III. W. H. Wood was a witness for the state. He was an accountant, and of some months' experience in a bank. He stated that he had examined the books of the two banks with reference to discovering assets that might not have been reported, and also as to the solvency or insolvency of the banks at different times. He was then asked: "Do you know now what the condition of Cadwell's and the Boyer Valley Bank was, as to the assets of those banks being sufficient to pay the indebtedness of said banks, on the seventeenth of May, 1888, confining yourself to the condition of the two banks financially?" To this there was an objection on grounds that it was

*4. The same: opinions of expert accountants.*

incompetent, not the best evidence, and called for a conclusion. The question, however, was not answered, more than to say he could not state the condition at the time, but is important to understand the next question and the ruling. The question then was: "State, if you know, what the condition of these banks was on the first of January, 1888, as to being solvent or insolvent." The same objection to this question was overruled, and the witness answered: "I think I do." He then, under objections, stated that he thought them insolvent, and made the same statement as to their condition in October, 1888, at the time of the assignment. The witness was then permitted to refresh his memory from the books, and stated that, in his opinion, the banks were insolvent on the seventeenth of May, 1888, and that, in his opinion, from his examination of the books, the banks had been insolvent every year since, and including, 1883. He then stated that from the books it appeared the liabilities of each of the banks, for each year from 1883, inclusive, to October 9, 1888, were in excess of the assets. The amount of the excess for each year is then stated. The examination of this witness was quite extended, and involved the results of his calculations from the book-entries as to bills receivable and bills payable, the real estate of the banks, the capital stock, and other items necessary to be known to determine the fact of solvency.

Enough of the testimony has been stated to understand the purport of our ruling. The testimony was under objection; and it is particularly urged that he should not have been allowed to state his conclusions as to the solvency of the defendants. The witness did not give his opinion, independent of *data* as to their solvency, but he merely gave the result of his calculations. It is true that in making these estimates, by which the final result was reached, the witness used estimates, made by himself and others, including the assignee, of the value of the assets; but the result of the estimates appears in the accounting, and his

conclusions as to solvency are based on the figures presented. Other witnesses also examined the books, and made special investigation as to the *status* of the firm, and, with their statements somewhat in detail as to their means of knowledge, gave it as their opinion that the firm was insolvent. Appellants claim, under the authority of *Hall v. Ballou*, 58 Iowa, 585, that it was improper for the witnesses to give their opinion as to the solvency of the defendants. We do not think the case authority for their claim. In that case a witness said he only knew of the solvency of the party from "general reputation." The question then was: "State whether or not he is solvent or insolvent." The question was held improper, and rightly so, on authority. General reputation is not admissible to prove insolvency. The court said: "The personal opinion of the witnesses was not admissible for any purpose," but the statement of the court was based on the showing made. The witness had no information on which to base an opinion. In this case the facts are very different. The witnesses had made careful investigation as to what property was in existence, its value, and the liabilities of the defendants. They knew of the character of the assets, as to being convertible within a reasonable time, and had opportunities for knowing whether the facts as to solvency, under the rule given by the court, existed. We think there was certainly no error in the admission of the testimony.

One J. V. Mallory, who had been a cashier in the Boyer Valley bank for some years, and knew of its condition to the fall of 1887, and who had had conversation with one of the defendants tending to show to some extent the condition of the firm, was asked if he knew the condition of the firm as to solvency in the spring of 1886. There was an objection to the question, which was overruled. The witness did not answer the question, but stated that he should not think they were solvent. It was certainly proper to inquire if the witness knew their condition. The answer was not

responsive, and no effort was made to rid the record of the answer given; and we do not think appellants can now complain.

Two witnesses were offered by the defendants to show the value of their respective homesteads, as bearing on the fact of solvency, whom the court rejected; and the appellants urge that they had the right to include the value of their homesteads in the aggregate of their assets. In making the assignment for the benefit of their creditors, the defendants reserved to their own use their homesteads, and hence they were in no sense assets to be offset against the liabilities, under a rule of solvency hereafter announced in this opinion, and there was no error in the ruling.

5. THE same: value of defendants' homesteads.

A question is made as to the right of the witness to state the results of his examination of the books, on the ground that the books themselves are the best evidence of their contents. This method is very common in practice, and, we think, correct. While the books were in evidence, the task of tracing them through years of entries, to determine so intricate a question, if possible for the jury, was not practicable; and in such a case, while the books are the best evidence as to their contents, the jury may be aided by other evidence to understand them; the books remaining to verify the truth of the statements made. If, in a trial, an instrument written in a foreign language is put in evidence, while the paper itself is the best evidence of its contents, expert testimony is competent to translate and bring it to the understanding of the jury. The rule is no less available in cases where juries require assistance to understand long and difficult accountings. Take a case where books or records contain the best evidence of scientific calculations or measurements. A high degree of mathematical skill and experience is necessary to understand them. The books are the evidence of the fact to be established, but expert testimony is competent to aid the court to fairly comprehend and weigh it.

6. THE same: opinions of expert accountants: best evidence.

IV. The court permitted an investigation into the resources and liabilities of the bank designated as "Cadwell's Bank," and the one known as the "Boyer Valley Bank," and appellant urges that in so doing there was error; that the deposit was in the bank known as "Cadwell's Bank," and that the Boyer Valley Bank had no relation to, or connection with, the transaction; and that to allow its affairs to be investigated was certainly error. To a proper understanding of the question, we look to the statute defining the offense, and to the indictment. The act provides that if any "bank, banking house, exchange broker, * * *. firm, company, corporation or party shall receive or accept deposits * * * when insolvent," etc. The indictment charges that P. Cadwell and W. C. Cadwell, "on or about the seventeenth of May, 1888, * * * being engaged in the banking business under the firm name and style of 'Cadwell's Bank,' and then and there as such bankers, being insolvent, * * * did accept and receive a deposit," etc. We think a fair interpretation of the indictment is that the defendants are indicted as members of a firm engaged in the banking business, and that the firm, being insolvent, received the deposit. The act, in defining who may commit the offense, specifies a firm, among others. As we view it, then, it was necessary to show that the banking firm was insolvent. This same firm owned and controlled two banks in the county of Harrison; and while, in some respects, the banks were distinguishable as in name, and perhaps in business management, the assets of the two banks were the assets of the one firm, and the liabilities of the two banks were the liabilities of the one firm. Being but a copartnership, the entire assets of the firm constituted its resources for the payment of its debts, and the entire liabilities of the firm constituted the charges or claims against such resources. Hence we do not see how the insolvency of the firm could be shown except by a marshaling of the entire assets and liabilities. If it were

*7. The same: two banks owned by indicted firm.*

true that the Cadwell Bank was but a trifle below solvency, considered with reference to its own resources and liabilities, and the Boyer Valley Bank largely above, the one barely insolvent,—and the other rich in available resources, the firm owning the two could not be said to be insolvent, nor could the depositor in the Cadwell Bank be in the situation contemplated by the act in making the receipt of the deposit a crime.   In such a case, the firm on which the depositor relied, and which would be legally responsible to him, would be solvent, and the condition contemplated by the law to constitute the offense would not exist.   We do not think it was error to permit an inquiry as to the condition of the two banks.

V.   Defendants presented to the court a series of instructions, sixteen in number, designed to cover the entire law of the case, a part of which are substantially embodied in the charge of the court.   Defendants, however, complain that in many respects the court fell into error.   Several of the grounds of complaint as to the instructions involve the principles discussed as to the admission of the testimony, and it will be unnecessary to consider them again.   To illustrate :   The instructions asked made it necessary, in order to convict, for the jury to find that the deposit was received personally by the defendants; that it would not be sufficient to show that it was received by their cashier upon their authority.   The court's instructions gave the law in accord with our view as hereinbefore expressed.   With this statement, it will be unnecessary to refer to quite a number of points made in argument.

In the third paragraph of the court's charge it incorporates the substance of the act quoted at the commencement of this opinion.   Appellants, in argument, italicise the words, "or be accessory, or permit, or connive at, the receiving or accepting on deposit, therein or thereby," and urge that such words have no application to the case.   If we agree to the criticism,

8. FRAUDULENT banking : instruction as to form of crime not charged.

The State v. Cadwell.

we must then ask, of what avail is it? The court, in its instructions, tells the jury of what the defendants are indicted, and what facts must be proved to justify a conviction. There are other words in the law as quoted, not essential to this case, but entirely harmless, as we think these are. We incline to the view that this point is urged because of the position taken, that the receipt of the deposit by the cashier would not warrant a conviction of defendants, and that, as they were indicted for receiving the deposit, they cannot be convicted for permitting or conniving at the deposit. It is manifestly clear that the court never designed to submit a question on that particular phase of the law, nor could the jury, in reason, have thought so. The court instructed the jury as to the deposit being received or accepted by the defendants, and said that it was not necessary that the evidence should show that the defendants, or either of them, in person received or accepted the deposit; that it was enough if it was received by their officer or agent "under their authority." There is quite an extended citation of authorities to the effect that it is error to instruct the jury as to an issue not involved in the case. The court presented no such issue to the jury, and hence the authorities are of no avail.

VI. Complaint is made that the court nowhere instructed the jury that the deposit must have been
9. ——: instruc-  knowingly received or accepted. If we
tions as to  agree that a correct rendering of the law is
knowledge.
that the party indicted, to justify conviction, must knowingly receive or accept the deposit, and with knowledge of the insolvency of the bank, we then think the instructions sufficiently broad. As to knowingly receiving and accepting the deposit, if they received it themselves, they must have known it; but this they did not do. It was done by their cashier; and the court, in that respect, told the jury that in such a case it must have been on their authority. If it was received on their authority, they must have known it; they must have authorized it. As to the knowledge of the insolvency of the bank, the jury is expressly told, in the

The State v. Cadwell.

eighth instruction, that they must have received the deposit, knowing the firm to be insolvent. We see no ground for just complaint in this respect.

VII. Upon the question of what constitutes solvency or insolvency in the application of a criminal statute, there is a wide difference of opinion, and the court's instruction on that branch of the case is vigorously assailed. The newness and the importance of the question leads us to set out the instruction, and it is as follows: " Par. 4. This statute was enacted to protect depositors in banks and banking institutions, and to punish fraudulent banking. The word 'insolvent,' in its ordinary sense, as applied to an individual, means inability to pay all just claims or debts. So, also, a party who is unable to pay his debts, according to the usages of the trade, or proceed in business without a general arrangement with his creditors, or by indulgence by way of extension of time of payment, is insolvent under our insolvent laws. The word 'insolvent,' as used in this statute and in the indictment herein, and applied to a bank, or firm, or a company engaged in the business of banking, means inability to meet liabilities in the usual course of business; and, if the assets of a banking firm are insufficient in value to pay the debts of such firm, then such firm is insolvent. A bank or banking firm is solvent, within the meaning of this statute, when it possesses assets of sufficient value to pay, within a reasonable time, all its liabilities through its own agencies, and is insolvent when it does not possess assets of such value. One of the questions for you to determine from the evidence is whether the banking firm composed of the defendants P. Cadwell and W. C. Cadwell was insolvent about May 17, 1888. The funds of a bank are supposed to be ready at hand to meet the wants of its patrons, and of the commercial, trading and manufacturing communities in which they are located. So, in determining this question, you will consider all the evidence before you relating thereto,

10. ——: insolvency: what constitutes.

the amount and character of the assets of the defendants' firm, both under the name 'Cadwell's Bank' and 'Boyer Valley Bank,' and the reasonable cash value thereof; the uncertainty, if any has been shown, of being able to realize on such assets, in a reasonable time, a sufficient amount to meet liabilities of the firm; the availability, or want of availability, of such assets, as carrying of debts upon which little or nothing can be realized except after long delays; investments in real estate which may take time to turn into current funds; any and all such circumstances, if any, appearing in evidence, will be considered by you; and if you find beyond a reasonable doubt that the assets of said banking firm, at the time and place mentioned in the indictment, computing such assets at their reasonable cash value, without regard to cost, were insufficient in value to pay all the debts of said firm, under both the names of 'Cadwell's Bank' and 'Boyer Valley Bank,' within a reasonable time, in the ordinary course of business, then you will find that the said banking firm was then and there insolvent."

That portion of the instruction which reads: "The funds of a bank are supposed to be ready at hand to meet the wants of its patrons, and of the commercial, trading and manufacturing communities in which they are located," is quoted by appellants; and they urge that thereby the jury was given to understand that, unless the funds of defendants' banks were so ready, they were insolvent, and the rule is denounced as "fallacious" and "senseless." We think the greater mistake rests in attaching to the language a meaning not intended, and not properly deducible. The part of the instruction quoted does not pretend to give a rule as to insolvency, for that is definitely stated in another part of the same instruction. The instruction attempts to explain, somewhat, the general relation of banks to the public, evidently as an aid to the jury to better understand the definite rule as to solvency which is given, and, in determining the correctness of the rule,

this language, of course, should be considered with the other, and from all the language determine the correctness of the proposition.    The learned judge below is not without strong support, both as to the legality and propriety of the language used, for nearly the same language is used by a federal judge, of unquestioned learning and much experience, in the state of Missouri, in his charge to a jury, defining for it the word "insolvent," as used in a similar statute.    We give to the clause of the instruction no greater approval than to say it is not vulnerable to the criticism made upon it.

Appellant refers to, and apparently relies with much confidence upon, the rule as announced in *McKown v. Furgasen*, 47 Iowa, 637, as properly defining the word "solvent."    In that case the court below held the rule to be that a party, to be solvent, must have property sufficient to pay debts liable to execution.    This court disapproved the rule, and said: "Solvency is ability to pay all debts or just claims. Insolvency is inability to pay such debts.    A party may have this ability whose property is not subject to execution.    Such persons cannot, in any proper sense, be said to be insolvent."    This language is used in a case involving the fraudulent transfer of a note ; the alleged fraud consisting in false representations as to the solvency of the maker.    If the rule announced in that case is to obtain in all cases, then, of course, the court's instruction in this case is wrong, and the judgment should be reversed.    We, however, think the rule as to solvency is not invariable.    Its proper construction is dependent upon the conditions surrounding, and the purpose to be accomplished by its use.    In the act in question, it is employed with reference to the security or protection of depositors in banks.    It would certainly be a narrow construction to say that the law designed no more than to protect parties against absolute loss of money deposited.    It would be nearer in harmony with the spirit and purpose of the law to say that its design was that depositors should receive their

money in substantial accord with their understanding when deposited, and that any bank whose affairs are so situated that it cannot meet its demands in the usual course of business is, within the meaning of the law prohibiting the receipt of depositors, insolvent. If the letter of the statute will permit it, such a construction certainly meets the justice of the case. A statute certainly would not be open to criticism, from a standpoint of justice, whose provisions were that no institution, having the confidence of the people as a depository, should be permitted to receive their funds, even when their use must be to tide it over a period of uncertainty, and much less in view of a prospect of suspension. Depositors, with the knowledge of such facts, would not make the deposits, and hence their receipt, with silence as to the facts, is a fraud. Does our statute contemplate less than to make such fraud a crime? Insolvency bears close relation to, and in fact is necessarily a part of, the laws relating to assignments for the benefit of creditors, and of bankrupt acts; and in these connections the word has repeatedly received judicial construction.

The case of *Daniels v. Palmer* is a Minnesota case, reported in 35 Minn. 347; 29 N. W. Rep. 162; and the legal significance of the word in that case arises under the provisions of the insolvent laws of the state. We make the following quotations from the case, including authorities cited therein : "The court, in his charge, instructed the jury that 'an insolvent is a person whose estate is not sufficient to pay his debts, or one who is unable to pay his debts from his own means. A person is solvent who has property subject to legal process sufficient to satisfy all his legal obligations.' An exception to this instruction raises the principal question on this appeal, viz.: What constitutes insolvency, within the meaning of this statute? The term 'insolvency' is not always used in the same sense. It is sometimes used to denote the insufficiency of one's entire property and assets to pay all his debts. This is its popular and most general meaning. *Herrick v. Borst*, 4 Hill, 650.

The State v. Cadwell.

But it is also used, in a more restricted sense, to express the inability of a person to pay his debts in the ordinary course of business. This is the sense in which it has been invariably held to have been used in all the various bankrupt acts of England and America. In *Bayly v. Schofield*, 1 Maule & S. 338, it is said : ' " Insolvency," as respects a trader, means that he is not in condition to pay his debts in the ordinary course, as persons carrying on trade usually do, and it does not follow that he is not insolvent because he may ultimately have a surplus upon the winding up of his affairs.' So, in *Shone v. Lucas*, 3 Dowl. & R. 218, it is said : ' " Insolvency," within the meaning of the bankrupt laws, does not mean an inability to pay twenty shillings on the pound, when the affairs of the bankrupt shall be ultimately wound up; but a trader is in insolvent circumstances when he is not in condition to pay his debts in the usual and ordinary course of trade.' The same definition has been given of the term as used in the insolvent law of Massachusetts, which, in respect to the matter now under consideration, is very similar to our own. Gen. St. Mass. 1860, c. 118, sec. 89 (Pub. St. Mass. c. 157, sec. 96). In *Thompson v. Thompson*, 4 Cush. 127, SHAW, C. J., says : 'By the term "insolvency," however, as used in these statutes, we do not understand an absolute inability to pay one's debts at some future time, upon a settlement and winding up of all a trader's concerns, but a trader may be said to be in insolvent circumstances when he is not in a condition to pay his debts in the ordinary course, as persons carrying on trade usually do.' This definition has been repeatedly reasserted by the same court. *Lee v. Kilburn*, 3 Gray, 594; *Vennard v. McConnell*, 11 Allen, 561; *Barnard v. Crosby*, 6 Allen, 327. The same construction has been placed upon the term as used in the late United States bankrupt act. Rev. St. U. S., sec. 5128. In *Toof v. Martin*, 13 Wall. 40, the court, after referring to the more general and popular meaning of the word 'insolvency,' adds : 'But it is also used, in a more restricted

sense, to express inability of a party to pay his debts as they become due in the ordinary course of business. It is in the latter sense that the term is used when traders and merchants are said to be "insolvent;" and, as applied to them, it is the sense intended in the act of congress.' To the same effect see *Wager v. Hall*, 16 Wall. 599; *Buchanan v. Smith*, 16 Wall. 308; *Dutcher v. Wright*, 94 U. S. 557; *Bank v. Cook*, 95 U. S. 342."

The supreme court of Pennsylvania, having the insolvency of a person under consideration, as bearing on his right to administer an estate, said : " Insolvency is the state of a person who, from any cause, is unable to pay his debts in the ordinary or usual course of trade. A man, to avoid insolvency, is not expected to be able, at once, to put his hand in his pocket, and pay every debt he owes, but he must be able to pay or to provide for all his debts as they fall due in the usual course of business." *Levan's Appeal*, 3 Atl. Rep. 804. That case has reference to a party not in business, but its importance lies in the fact that his solvency is being considered in relation to his legal capacity to receive and control the property of others; and the court, in that connection, seems to have given the word a restricted meaning, as is the case with regard to merchants and tradesmen.

The federal court in Missouri, having under consideration the word "solvent," as used in an act making it larceny for insolvent banks to receive deposits, which act, for the purpose of defining the word, is not different from ours, said in its charge to a jury : "In the ordinary acceptation of the term 'insolvent,' when applied to a bank, means inability to meet liabilities in the usual course of business. But a bank may be solvent, and yet, from temporary causes, over which its officers have no control, suspend until these causes can be overcome; but they must be causes for which prudence and foresight cannot provide, or over which the bank or its officers have no control, or could have none." The court afterwards added : " I pass to this branch of the case with the declaration that a bank is solvent,

within the meaning of the constitution and statutes we are considering, when it possesses sufficient of assets to pay, within a reasonable time, all its liabilities, through its own agencies, and is insolvent when, from the uncertainty of being able to realize on its assets, in a reasonable time, a sufficient amount to meet its liabilities, it therefore makes an assignment by which the control of its affairs and property passes out of its hands." *Dodge v. Mastin*, 17 Fed. Rep. 665. It will be observed that the district court took the germ of the instruction under consideration from that case; and, when the entire instruction is considered, we think it is in harmony with the spirit of the law as generally interpreted, and that it is designed to meet the evident purpose of the statute.

Defendant asked some three instructions bearing on this particular branch of the case, some of which are the opposite of the rule we have approved. If one of them may be said to be in harmony with the rule, the ground is equally well covered by the instruction given.

VIII. Appellants asked instructions bearing on impeaching testimony, and complain of their refusal; but the court gave such as to properly guide the jury in that respect, and we will not consider them further.

IX. Appellants' last claim is that, under the testimony, the conviction cannot be sustained. That view of the case rests on a rule of law as to solvency at variance with that given by the court, and which we have approved. Under the rule given, and the testimony, there is little room for doubt that this firm was insolvent in May, 1888, and from that time forward was protracting its existence as a banking firm in violation of the laws of the state. It may be truthfully said that if the condition of the firm had been known for some years before its collapse no person would have ventured a deposit in its hands. Its deposits were received as a result of fraudulent concealments. It must be admitted that the defendants received deposits, and that of Mrs. Oliver among the rest, when they knew they could not meet the demands against them in the ordinary course of

business. That they may have believed that, with time and indulgence, they could have settled all demands, is no excuse for taking the money of those who made their deposits under a different expectation. To our minds, the evidence sustains the verdict, and the judgment is                                      AFFIRMED.