No. 31,312

The State of Kansas, *Appellee*, v. A. F. Ohlfest, *Appellant*.

(30 P. 2d 301.)

Opinion filed March 10, 1934.

*F. J. Oyler, G. R. Gard* and *Stanley E. Toland,* all of Iola, for the appellant.

*Roland Boynton,* attorney-general, *Everett E. Steerman,* assistant attorney-general, and *Frank W. Taylor,* county attorney, for the appellee; *Hugo T. Wedell,* of Chanute, special counsel.

The opinion of the court was delivered by

Burch, J.: Defendant, who was cashier and also director of the State Bank of Elsmore, was convicted on two counts of an information charging him with accepting deposits when the bank was insolvent and when he knew it to be insolvent. Defendant appeals.

Defendant was prosecuted under R. S. 9-119, which provides that no bank shall accept or receive on deposit any money when the bank is insolvent, and that any director or cashier who shall knowingly violate the provisions of the section shall be guilty of felony. The prosecution was based on deposits personally accepted by defendant on December 24, 1931, and one question was whether the bank was insolvent on that day.

The statute defines insolvency as follows:

"A bank shall be deemed to be insolvent—*first,* when the actual cash market value of its assets is insufficient to pay its liabilities; *second,* when it is unable

to meet the demands of its creditors in the usual and customary manner; *third,* when it shall fail to make good its reserve as required by law." (R. S. 9-133.)

No proof was offered under the first definition. There was evidence the bank was insolvent under the second definition, and that defendant knew it was insolvent. The evidence was abundant and convincing, and will not be summarized here. Defendant contends, however, he was not subject to prosecution under the second definition of insolvency. R. S. 9-119, providing punishment for knowingly receiving deposits when the bank is insolvent, was formerly section 16 of chapter 43 of the Laws of 1891. The statute of 1891 did not define insolvency. The argument is that in 1891 insolvency as applied to a bank had but one meaning—excess of liabilities over assets and that meaning governs application of R. S. 9-119.

In 1891 there were two well-understood meanings of the term insolvent: excess of liabilities over value of assets, and inability to pay debts in usual course of business as they fall due. In February, 1890, the supreme court of Iowa reviewed the authorities and, in the light of the authorities, construed the provision of its banking law corresponding to section 16 of the 1891 statute of this state. The syllabus reads:

"A firm engaged in banking is insolvent, within the meaning of chapter 153, Laws of 1880, making it a crime for bankers to receive deposits knowing of their insolvency, when it is unable to meet its liabilities as they become due in the ordinary course of business; and bankers who receive deposits, knowing themselves to be thus insolvent, cannot escape the penalty of the law on the ground that they believe that, with time and indulgence, they can settle all demands." (*The State v. Cadwell,* 79 Ia. 432, syl. ¶ 10.)

The case of *State v. Myers,* 54 Kan. 206, 38 Pac. 296, decided in 1894, interpreted section 16 of the statute of 1891, now R. S. 9-119. The syllabus reads:

"The law of the state does not require a bank receiving deposits and transacting a banking business to retain on hand all of the money of its depositors. The bank is not generally expected to be able to pay every depositor at once, but, if solvent, it must be able to pay or provide for its deposits and other debts as they are demanded in the usual course of business." (¶ 6.)

In the opinion the following definition of insolvency, contained in a requested instruction, was approved:

" 'Insolvency,' in the ordinary acceptance of the term, when applied to a bank, means inability to meet liabilities in the usual course of business." (p. 215.)

The banking law was revised in 1897, and what is now R. S. 9-133

was inserted defining insolvency. (Laws 1897, ch. 47, § 31.) At the same time section 16 of the law of 1891 was repealed, but the same matter was inserted in the new act. Section 31 of the 1897 law was new, was devoted to the single subject of insolvency, and the meaning which the term bore as it was used in the earlier act, inability to meet demands in usual course of business, was continued in force in the second subdivision of the definition.

The courts disagree respecting interpretation of statutes defining insolvency when criminal liability of a bank officer is involved. It is not necessary to review the decisions. The opposing views are fairly presented in *State v. Syverson*, 39 S. Dak. 638, and *State v. Rodman*, 57 N. Dak. 230. The question is not an open one in this state. If in the course of conduct of the bank's affairs its condition becomes such that when depositor Paul wants some of his money the bank cannot pay him, the bank must not accept depositor Peter's money. If, as thus interpreted, the statute is a harsh one, the remedy is by invoking legislative action, and not by appeal to this court.

It will be observed the second definition applies only when the bank is unable to meet the demands of creditors in usual and customary manner. Unusual situations, created by circumstances not according to banking habit, practice, procedure, or experience, are excluded. In this instance, the last day the bank was open for business was December 24. Defendant had been expecting a bank examiner would appear to examine the bank. On December 25 he went to Iola, where he knew a bank examiner would be, and told the examiner something of the condition of the bank. Defendant thought he had been experiencing a quiet run. He had been, but the run was from the inside of the bank.

On December 24 defendant withdrew the balance of his personal account, in the sum of $1.84. On the 23d he withdrew the balance of his account as executor, in the sum of $105.29. There was an account of an insurance company on the books, and on the ledger sheet appeared the name A. H. Ohlfest. An unsuccessful attempt was made to erase the name, and on the 24th the balance of that account, $14.60, was withdrawn. Lucy G. Ohlfest was defendant's wife and was an employee in the bank. She withdrew her small balance. There was an account on the books, "Lucy G. Ohlfest, Special," and on the 23d and 24th the entire amount of that account was withdrawn, in the sum of $941.84. There was an account on the books, "Ohlfest, Special," and on the 24th the balance in the sum

of $700 was withdrawn. Frank Goyette was president of the bank and father of Lucy G. Ohlfest. Within the month the balance of his account was withdrawn by two checks, one for $776.81, and one for $510.72. The balances of defendant's children in small sums were withdrawn, and there were other withdrawals. There was an account on the books designated "Reserve," and on the 24th a check was drawn on this account in the sum of $260 to pay salaries of defendant and all employees of the bank for twenty-six days of December.

The foregoing were not withdrawals of the kind which create one of the unusual and extraordinary situations referred to, in which deposits are accepted while the bank officials are struggling in good faith to keep the bank open. Defendant says the withdrawals were all satisfactorily explained. The explanations may have been satisfactory to defendant. Manifestly they were not satisfactory to the jury and the trial judge, and it is not likely they would satisfy Fannie Braden, who on December 24 was paid the amount of a time certificate for $200, then due, but who could get only $20 in cash of her checking account of $270, because defendant told her he did not have the money.

There was testimony the bank was not able to maintain its reserve. In submitting the case to the jury, the court read both the second and the third definitions of insolvency contained in R. S. 9-133. There was no proof the bank had failed for a period of thirty days to make good its reserve after notice by the bank commissioner to do so, and defendant requested an instruction to the effect he could not be convicted under the third subdivision of the statute, because of lack of proof of the kind indicated. The instruction was refused.

The third kind of insolvency specified in the statutory definition is—

"When it shall fail to make good its reserve as required by law." (R. S. 9-133.)

One provision of the law is as follows:

"Every bank doing business under this act shall hold and maintain a reserve consisting of fifteen per cent of the aggregate amount of its demand deposits and five per cent of the aggregate amount of its time deposits." (R. S. 1933 Supp. 9-112.)

The banking act also contains the following provisions:

"The bank commissioner may suspend for a period not to exceed thirty

days, and from time to time renew such suspension for periods not to exceed fifteen days, any reserve requirements specified in this act." (R. S. 9-115.)

"Any bank whose reserves are below that required by this act, which shall violate any regulation or requirements of the state bank commissioner as to such reserves, and shall fail to restore its reserves, for a period of thirty days after being notified so to do, may be deemed insolvent, and the state bank commissioner may take possession thereof and proceed in the manner provided by law as to insolvent banks." (R. S. 9-116.)

R. S. 9-116 contains a special definition of insolvency consisting in violation of regulations or requirements of the bank commissioner relating to reserve, and authorizes the bank commissioner to close the bank on account of such insolvency. Defendant was not prosecuted under that section of the statute, and the requested instruction was not pertinent to the case.

Unlike the statutes of some states, R. S. 9-133 does not say a bank is insolvent when it fails to restore its reserve as required by the bank commissioner. It says a bank is insolvent if it fails to make good its reserve as required by law. Amount of reserve is subject to regulation by the bank commissioner; but if he has made no regulation, the statutory reserve must be held and maintained. The language of R. S. 9-133 is not that the bank is insolvent if it shall fail to "restore" its reserve; it is insolvent if it fails to "make good" its reserve. "To make good" means specifically to fulfill an obligation. (Webster's New International Dictionary, title *make*.) In this instance the statutory obligation is to "hold and maintain."

While the subject is not material here, doubtless a reasonable interpretation of the statute would be that inability to maintain the required reserve for a brief period, caused by unforeseen and unusual circumstances, would not entail liability; but when the affairs of a bank reach such a state that in normal course of business the legal reserve cannot be maintained, the officers of the bank must either obtain a suspension of reserve requirements by the bank commissioner, or accept deposits at their peril. Once more, if as thus interpreted the statute is a harsh one, the remedy is by invoking legislative action, and not by appeal to this court.

Complaints of the proceedings not covered by the foregoing have been considered, and are held to be without substantial merit.

The judgment of the district court is affirmed.