COCHRAN v. HAMBLEN. (No. 481.)

(Court of Civil Appeals of Texas. Beaumont. June 26, 1919. Rehearing Denied Oct. 22, 1919.)

1. EVIDENCE ⟸354(14) — ADMISSIBILITY OF STATEMENT MADE UP ON ADDING MACHINE FROM BOOKS IN EVIDENCE.

In an action involving book accounts where the books were in evidence, it was not error to admit a statement, which plaintiff testified he had made up on an adding machine from the different books or registers, showing the amounts in question; such statement containing all that the books would have shown had they been exhibited page by page to the jury, and it being impracticable to go through the books before the jury and check out the items shown by such statement.

2. EVIDENCE ⟸158(28), 471(20)—STATEMENT OF VALUE OF BUSINESS SOLD NOT CONCLUSION OF WITNESS.

In an action involving book accounts as evidence of the value of a business transferred, plaintiff's testimony that the business was worth "around $14,000" held not subject to exclusion on objection that it was the conclusion of the witness and that the volume of the business that was done would be reflected by the books, which would be the best evidence, where it appears that the books which plaintiff testified he kept were in evidence and were accessible to defendants.

3. APPEAL AND ERROR ⟸1061(4)—INSTRUCTED VERDICT FOR PLAINTIFF NOT REVERSIBLE ERROR.

Where the plaintiff announced ready for trial, and the court heard arguments of attorneys as to the propriety of giving the jury an instructed verdict for plaintiff, and informally stated that he would permit plaintiff to withdraw his announcement and let the case go over the term to permit amendment of pleadings and, on return, after the noon adjournment, announced that he had changed his mind and instructed the jury to return a verdict for plaintiff, instructed verdict was not reversible error; no prejudice resulting from conduct of court.

4. TRIAL ⟸140(2) — INSTRUCTED VERDICT WARRANTED BY EVIDENCE.

In an action to recover wages as agent of the defendant insurance agency, and to recover

for an agency business sold by plaintiff to defendant insurance agency, where the court instructed the jury to find for plaintiff, the objection that the credibility of a witness was a question for the jury, and that the court erroneously assumed the truthfulness of plaintiff's unsupported testimony, *held* not well taken, in view of the fact that books and the other evidence introduced sufficiently corroborated plaintiff's' testimony to warrant the instruction.

5. PRINCIPAL AND AGENT ⬷⟵81(5) — ACTION FOR COMPENSATION ON BREACH OF CONTRACT BY PRINCIPAL.

In an action for plaintiff's salary as defendant's agent, the failure of defendant to pay plaintiff's past-due salary was a breach of contract, giving plaintiff a cause of action for past-due salary, and justified plaintiff in rescinding the contract, or refusing to work longer, but is not necessarily evidence of nor tantamount to plaintiff's discharge.

6. PRINCIPAL AND AGENT ⬷⟵89(8)—EVIDENCE INSUFFICIENT TO SHOW DISCHARGE OF AGENT.

In an action by an agent against a principal for wages past due, evidence *held* insufficient to sustain a verdict based on the theory that plaintiff had been discharged.

7. PRINCIPAL AND AGENT ⬷⟵89(5)—ALLEGATION SHOWING BREACH OF CONTRACT AND NOT DISCHARGE OF AGENT.

An allegation that the principal refused to pay the plaintiff agent one month's salary and the past-due portion of two months' salary, and notified plaintiff that he would not pay him in the future, alleges a breach of contract, but not in law a discharge, and to allege a discharge it must be made to appear that the principal intended such action as a discharge, or that the agent was forced to use his salary for living expenses, and that this was known to the principal, and that he knew his failure to pay such salary as it accrued would force the agent to seek other employment.

Appeal from District Court, Harris County; J. D. Harvey, Judge.

Action by Tolar N. Hamblen against J. B. Cochran. Judgment for plaintiff, defendant's motion for new trial overruled, and defendant appeals. Affirmed in part, and reversed and remanded in part.

Moody & Boyles, of Houston, for appellant.
A. R. & W. P. Hamblen, of Houston, for appellee.

WALKER, J. The following statement of the nature and result of this suit is taken from plaintiff in error's brief:

This was an action on contract, brought by the defendant in error, Tolar N. Hamblen, against the plaintiff in error, J. B. Cochran, in the district court of Harris county, Tex.,

and resulting in an instructed verdict for the defendant in error for $2,455.

On the 23d day of November, 1915, the defendant in error, hereinafter referred to as Hamblen, entered into a contract with the plaintiff in error, J. B. Cochran, hereinafter referred. to as Cochran. Inasmuch as this contract is the basis of the suit and is short, we quote it in full:

"This contract made and entered into by and between J. B. Cochran, proprietor of the Cochran Insurance Agency, party of the first part, and Tolar N. Hamblen, party of the second part, witnesseth:

"For, and in consideration of the covenants and agreements as hereinafter provided, the party of the first part hereby assigns and transfers to the party of the second part, a one-fourth (¼) interest in and to the business of said Cochran Insurance Agency.

"II. The party of the second part hereby assigns and transfers to the party of the first part, his insurance business conducted under. the name of Tolar N. Hamblen & Company, which said business produces approximately ten thousand dollars ($10,000.00) per year in gross premium.

"III. The party of the second part agrees to give his entire time and attention to the business of the said Cochran Insurance Agency and to engage, during the first year, in the work of soliciting insurance, and he agrees to produce in new premium, for said insurance agency, an average of at least one thousand ($1,000.00) dollars per month in gross premiums during the first year of this contract, in addition to renewals and extensions of insurance brought into the said Cochran Insurance Agency by the said Tolar N. Hamblen in the transfer of the business of Tolar N. Hamblen & Company.

"IV. The party of the second part agrees to pay, in addition to the covenants and agreements hereinabove set forth, to the said J. B. Cochran, the difference between the value of the one-fourth (¼) interest in said Cochran Insurance Agency, transferred to the said Tolar N. Hamblen, and the value of the business of Tolar N. Hamblen & Company, at the present time, said payment to be made by the said Tolar N. Hamblen to the said J. B. Cochran out of the business of the said Cochran Insurance Company during the second year of this contract, and out of the profits coming to the said Hamblen during the second year's business.

"V. In the event that the connection hereby formed· is broken by reason of the failure of the party of the second part to produce the amount of new business required of him at the end of twelve months, then the party of the second part agrees to reconvey and reassign to the party of the first part, the one-fourth (¼) interest hereby transferred to the party of the second part, upon the party of the first part paying to the party of the second part 10 per cent. on the gross premiums of all old business brought into said Cochran Insurance Agency by the party of the second part, and the party of the second part, upon such payment, in addition to reconveying said

one-fourth (¼) interest as above provided, agrees not to engage in the local fire insurance business for a period of five (5) days from and after the expiration of twelve months from December 1st, 1915.

"VI. The salary of the second party shall be as follows: One hundred dollars ($100.00) per month for the first three (3) months, one hundred and twenty-five dollars ($125.00) per month for the next six (6) months and one hundred and fifty dollars ($150.00) per month for the balance of the first year.

"This contract shall be in effect from and after December 1, 1915.

"Witness our hands in duplicate this 23d day of November, A. D. 1915.

> "[Signed]        J. B. Cochran,
> "Party of the First Part.
> "Tolar N. Hamblen,
> "Party of the Second Part."

On the trial Tolar N. Hamblen on his own behalf testified, in substance, that under the contract he delivered to Cochran the business of Tolar N. Hamblen & Co.; that he delivered some registers, commonly known as "company registers," with copies of daily reports and copies of policies and a lot of expiration cards; that there was no record kept of the amount of new business that he brought into Cochran's insurance office; that he had absolutely no way of getting the exact figures of what he brought in; that approximately the amount of business he brought in for the first month was $800, the second month approximately $500, the third month about $300, the fourth month about $500, and the last month about $200, and that was the last month that he was there; that for the first three months Cochran paid him $100 per month as salary; that at the end of the fourth month he gave him $100; and that he went back to Cochran and said, "Didn't you make a mistake?" Cochran answered, "No." He then said that he should have more than $100; that he should have gotten $125; and Cochran said, "Well, you are behind on producing your business." They then argued back and forth about the matter, and he just let it ride. The fifth month Cochran paid him $100; for the sixth month Cochran did not pay him anything; and at that time Cochran declined to pay him anything, and, after Cochran refused to pay him, he went out to look for a position; that he was not able to get one for a long time; that during the period ending December 1, 1916, after he left Cochran, he earned $45; that he asked Cochran to continue the contract and pay him; that the last time he heard of the books of Tolar N. Hamblen & Co., they were in Cochran's office; that he went through the books and registers and other books that he had at one time, but he did not at the time of trial have access to them; that he gave his entire time and attention to the business of soliciting insurance; that Cochran never paid anything

further for the business of Tolar N. Hamblen & Co.; that he never paid him any part of the balance of salary due him; that he did not tender or offer to pay him any part of the earnings of Tolar N. Hamblen, and of Cochran Insurance Agency.

On cross-examination Hamblen testified that he made demand on Cochran for payment on the day he informed him that he. was going to file suit, which he thought was the 1st day of June, 1916.

On redirect examination Hamblen testified that the business of Tolar N. Hamblen was one he had bought from Chapman and had owned for a year, and that the value of the business when he bought it was about $11,000, and that he used the Chapman business and his own business as the basis for the Tolar N. Hamblen & Co. business; that the volume of business when he turned it over to Cochran was around $14,000; that the little slip of paper which counsel handed him was one he had made up on an adding machine, from the different registers he had (from this register and those registers over there, referring to registers on counsel's table in courtroom), and showed the amount of premium, the name of the party, and the date it was written; that the account was a correct check as shown by those books, and showed gross premiums totaling $7,541.15 (this statement was offered in evidence by plaintiff); that the list showed the premiums for three and five year business; that he had all of the records of the business of Tolar N. Hamblen & Co. in a black book on counsel's table, outside of the records that were given Cochran, and the book showed the amount of business written, for whom and the amount of the premium; that he had checked that book to see what the total amount of the figures were, and that he kept the books himself up until May; that there was nothing on it since May; that these books showed total premiums each month, for January, 1915, $485, for February, $757.56, March, $1,612.03, April, $1,072.21, May, $887.39; that the book was never delivered to Mr. Cochran; that he kept the same record on expiration cards which were delivered to Cochran; that during the month of June, 1915, outside of the business shown on those registers, he placed some other insurance business with Rice & Belk on a brokerage basis, and Mr. Belk had those books of account; that the old expirations were in Cochran's office; that he brokered business with Mr. Belk, in June, July, and part of August and September; that he brokered some business with Gartner & Settegast, and in September and October with E. M. Winstead; that the amount done with Gartner & Settegast would be represented by their books, and the Winstead part by his books; that there were no expiration cards kept with reference to that business, only for the rec-

ords that he turned over to Cochran; that he had no record of the month of November at all except the expiration cards which were turned over to Cochran.

On recross-examination he testified that anything in the book (referring to the same book as above) from May on was not exactly right because he discarded that book; that there was something in the book for September, 1915, but it was not correct; that the figures for the month of September, 1915, was $795.23; that the entries there for the month of August totaled $57.90, and for the month of October, 1915, it showed $31.20; that there was no entry there for the month of November.

On redirect examination he testified that the amount of the business shown by the adding machine slip and the register and the amount of business shown in the books and the accounts that he brokered through Belk, Winstead, and Gartner & Settegast, was the business he turned over to Cochran.

Robert L. Gartner, witness for plaintiff, testified that Tolar N. Hamblen brokered with the firm of Gartner & Settegast during the month of August, 1915, insurance business amounting to the gross sum of $191.40, for the month of October $171.67.

C. C. Belk, witness for plaintiff, testified that he had brokered some business for Tolar N. Hamblen & Co. during June, July, and August, 1915. The June account was $616.-48, July $515.99, and that he did not keep any account current for the month of August, but that the individual items he picked out and checked over amounted to $196.60.

J. P. Demarais, witness for the defendant, testified that he kept the books in the office of J. B. Cochran for the period from December 1, 1915, through December, 1916; that he personally made, from the records of his office, a statement showing the business done by Tolar N. Hamblen through the Cochran Insurance Agency; that this statement showed for the six months period that Mr. Hamblen had brought in total fire and tornado premiums amounting to $1,121.99, total miscellaneous premiums of $156.80, in all a grand total of $1,278.79 (this statement was offered in evidence by the defendant); that it was a correct reflection of the business done by Tolar N. Hamblen as shown by the books; that Hamblen at one time checked over the account with him and told him that the statement was approximately $300 off of being correct; that, taking Mr. Hamblen's own figures and adding $300 to the total covering a period for six months, it would be a little over $200 a month average.

On cross-examination he testified that there was no separate account of the business brought in by Tolar N. Hamblen, or any one else, or what came in over the telephone;

that the statement was gotten up by him from memory of the accounts that Mr. Hamblen had brought in; and that Hamblen had stated to him, at the time he checked the account over, that the statement was approximately $300 off, and that he should be credited with approximately $300 more than he had been given credit for.

J. B. Cochran, on his own behalf, testified:

That he was the owner of the Cochran Insurance Agency and had been in the insurance business in Houston for nearly 40 years. That the reason why he did not pay Mr. Hamblen any more after May, 1916, was that every month he got a statement of the business done and went over them, and saw that Hamblen was doing practically no business. That he told Hamblen time after time that he was not producing any results, so in the latter part of May (probably the last part, if not the last day) Hamblen wanted some money, and the following conversation took place:

Cochran: "Tolar, you have not been producing anything like you represented your ability to produce, and have not been producing any results. You have done substantially nothing."

Hamblen: "I just cannot do any better."

Cochran: "You certainly do not want to be paid when you are not doing anything."

Hamblen: "Oh, yes, I do! I cannot produce that amount of business, and I know it; but I have a contract in which you have to pay me for the year."

Cochran: "Is that the way you look at it?"

Hamblen: "Yes, that is the way I look at it. So far as that contract is concerned, if I write $12,000 in premiums on the last day of the year, that would average $1,000 per month."

Cochran: "Suppose you did not write it?"

Hamblen: "You would get stuck."

Cochran: "Is that the way you look at it?"

Hamblen: "Yes, that is the way I look at it."

Cochran: "It looks like you want to perpetrate a fraud."

Hamblen: "You can take it that way if you want to."

Cochran: "There is not anything in the contract that says when I will pay you anything at all. I will simply wait to see when you deliver your end of the contract and I will deliver mine."

Hamblen: "If that is the case, I am going to bring suit."

Cochran: "If that is your pleasure, all right."

That Hamblen walked off, and from that day to the day of the trial they had had no conversation. That the books Hamblen turned over to him, which he was willing to turn back to him, had never been looked through by him, and he knew nothing about them; and that he had never attempted to use these books as a basis for writing new insurance. That the books were not delivered to him personally, but simply deposited in his office.

On cross-examination he testified that there was a contingency under the contract that Hamblen would not produce as much as $1,-

000 per month; that he did not have Hamblen's business; that it was in the contract for him to take Hamblen's business, and he contracted to pay for it under certain conditions; that he had not paid for it because he got nothing; that he had not paid his salary because he had not worked or produced results; that he had never offered to pay Hamblen any money for his business; that he kept an account of the business that Hamblen brought in; that every month he got a statement from his bookkeeper of the current accounts of the company; that every month he went over that list and made a list of what Hamblen had written, but that he did not have those lists; that he had made them, but he never did look at Hamblen's books to see what insurance he had and had not looked at them at the time of the trial; that he had never offered to return the business back to Hamblen; that Hamblen never asked for his books; that they were there and he could have gotten them any minute he wanted them; that the transaction had been nearly two years before the trial; that all the conversations he had with Hamblen occurred in his (Cochran's) office.

Tolar N. Hamblen, recalled on his own behalf, testified that he had never made the statement attributed to him by Cochran, while on the witness stand; that the conversation did not occur, and he never told Cochran that he wanted to be paid for what he did not do; never told him that he guessed he would be stuck; that he never told him that he was trying to perpetrate a fraud; that he had examined the books of Winstead & Co. showing his account with them; that he had examined them three or four months prior to the trial; that at the time he made a statement on the typewriter of the amount of that business; that he had such memorandum in a black book; that the amount of it for the month of September was $678.07, for October $688.66; that the total for the two months of September and October was $1,283.93; that that business was likewise turned over to Cochran; and that Cochran had never paid him anything for that business; that the first time Cochran made any complaint to him about not keeping up his affairs, was about a month or two before Cochran quit paying him, and at that time Cochran said, "Tolar, you are falling behind a little bit, and he answered, "I know I am a little bit, but I will catch up"; that that was the only time Cochran ever said anything to him about being behind, until the time Cochran quit paying him.

Plaintiff in error's motion for new trial was duly filed and overruled, to which he accepted and gave notice of appeal. Proper extensions of time were had, statements of fact and bills of exception were duly filed, application for writ of error and writ of error bond were duly filed and approved, and service of the writ of error was duly had.

The cause is therefore properly before this court for review.

As further explaining the nature and as giving a more complete statement of portions of the testimony, we give the following statement from the brief of defendant in error:

The statement contained in plaintiff in error's brief sets out the contract which is the basis of the suit, and to that extent it is adopted. The plaintiff in error has copied a portion of the statement of facts, which is not a brief statement of the nature and result of the suit, and does not correctly inform the court of the nature of the suit.

The suit was to recover unpaid salary for the months of May to December, 1916, and parts of the salary due for the months of March and April, and for $1,500, the value of the business of Tolar N. Hamblen & Co., being 10 per cent. of the annual gross premiums, as provided in the contract.

The trial resulted in an instructed verdict for plaintiff for $2,455, based on the unpaid salary for nine months, or $1,000, and $1,455, the value of the business of Tolar N. Hamblen & Co., as shown by the undisputed testimony.

Tolar N. Hamblen testified:

"I guess the books of Tolar N. Hamblen & Co. are in Mr. Cochran's office. They were the last I heard of them. They were delivered by me to Mr. Cochran's office. * * * He has all the records of my office that I took over there. * * * I have nothing whatever.

"That little slip that counsel has is a slip I made up on an adding machine from the different registers I had, from this register and those registers over there, and it shows the amount of the premium, the name of the party, and the date it was written. This account is a correct check as shown by those books."

Plaintiff also offered the statement in connection with the books from which it was made, said statement showing the gross premiums for three and five year business, and totaling $7,541.15.

He further testified:

"That is the book I kept my company accounts in when I was in business for myself. * * * It shows here on these books for each month. Total premiums for January $485, total premiums for February, $757.56, March $1,612.03, April $1,072.21, May $887.39; that is all shown by that book. There are other records on which the same business is shown. It is shown on my expiration cards. I delivered those expiration cards to the Cochran Insurance Agency. They showed when each one of these policies expires, the name of the parties and the property.

"In the month of June, 1915, outside of the three and five year business shown in these registers, I placed other insurance. I placed it with Rice & Belk. Mr. Belk had those books of account. The expiration cards are in Mr. Cochran's office. That was in June, July, and part of August; I brokered the business with Mr. Belk. The balance of August and September I

brokered some of that business with Gartner & Settegast, and September and October with E. M. Winstead. * * * I have no record of the month of November at all. I have had a record of that. That was expiration cards; I turned them over to Cochran's Insurance Agency. I have not seen them since.

"The amount of the business shown by that statement and these registers, and the amount of the business shown in these books and the amount that I procured through Belk and Winstead and Gartner & Settegast, is my business that I turned over to Mr. Cochran."

Robert L. Gartner testified:

"There is an account of Tolar N. Hamblen in there. * * * During the month of August, 1915, it was $191.40; during the month of October it was $174.67."

The witness stated that this was the business of Tolar N. Hamblen.

C. C. Belk testified that he had brokered or written some business for Tolar N. Hamblen & Co. during June, July, and August of 1915. The June account was $616.48, July $515.99, for part of August $196.60.

Tolar N. Hamblen also testified:

"That is a statement made by me at the time I examined the books of Winstead & Co., and is made from his books. * * * The total for the two months of September and October is $1,283.93 after deducting the canceled policy $52.80. That business was likewise turned over to Mr. Cochran. He has never paid me anything for that business."

[1] Plaintiff in error's fourth assignment of error is as follows:

"The court erred in admitting in evidence over the objection of defendant, as shown by defendant's bill of exception No. 4, a statement which plaintiff testified that he had made up on an adding machine from the different registers he had, showing the amount of premiums, the name of the party, and the date the business was written, and permitting plaintiff to testify from said list that it showed that the gross premiums upon the three and five year business of plaintiff turned over to defendant, was $7,-541.15."

As shown by appellant's fourth bill of exception, this statement was admitted under the following circumstances:

"Q. Mr. Hamblen, this little slip that I have here, what is it (referring to a statement shown on page 9 of the statement of facts)? A. That is a slip that I made up on the adding machine from the different registers that I had, from this register and those registers over there (pointing to the books on counsel's table in the courtroom).
"Q. And it shows what? A. The amount of the premium, the name of the party, and the date it was written.
"Q. I would ask you if this amount was a correct check as shown by those books? A. Yes, sir.

"Counsel for Plaintiff: I think, if he made this check from those books, that this check is admissible, and it is practically an interminable job to go through and check out each one of the separate items before a jury. I am going to offer this statement.

"(To the introduction of such slip or statement, counsel for defendant objected, for the reason that same was incompetent for any purpose, that it was a self-serving statement that the books of original entry are available, and that said statement will not be the best evidence, that it would be secondary evidence.)

"The Court: Offered in connection with the book, I will overrule the objection.
"Counsel for Plaintiff: I offer all the books and the statement.
"The Court: Overrule the objection.
"(The court having overruled said objection, the defendant then and there duly excepted.)"

The witness was permitted to testify further as follows:

"Counsel for Plaintiff: I wish you would take this (referring to said statement) and tell me the gross premiums shown on that statement. A. In order to do that, I will have to add this up (referring to one set of totals) and subtract it from this (referring to another set of totals).
"Q. Well, go ahead and do that. A. $7,-541.15."

It appears from this bill that this statement objected to contained all that the books would have shown had they been exhibited page by page to the jury. It further appears from the statements shown in the bill that it would have been "an interminable job" to go through the books and check out the items shown on this statement.

Jones on Evidence, § 206, states the rule as follows:

"Where the originals consist of numerous documents which cannot be conveniently examined in court and the fact to be proved is the general result of an examination of the whole collection, evidence may be given as to such result by any person who has examined the documents, and who is skilled in such matters, provided the result is capable of being ascertained by calculation."

The following rule is stated in Encyclopedia of Evidence, vol. 14, p. 730, § D:

"Compilations of computed matters compared in advance by witness for use in the trial are admissible where they involve the mere making of computations, and their accuracy is vouched for by the witnesses, and the original records are open to the other party."

In State v. Brady, 100 Iowa, 198, 69 N. W. 291, 36 L. R. A. 695, 62 Am. St. Rep. 564, Justice Deemer announced the rule as follows:

"Complaint is made of the ruling of the court in admitting what is known as Exhibits 7 and 13 to the jury. Exhibit 7 is a tabulated state-

ment made by one Patten, the agent of the Chicago, Milwaukee & St. Paul and the Wabash & Iowa Central Railroads, from the records of said companies, showing sales of tickets at Ottumwa during the year 1893, which were introduced in evidence after having been properly identified. Exhibit 13 was a written statement prepared by the auditor and his deputy, and purports to be a list of all the names of all paupers for which defendant filed claims for transportation, and received county warrants thereon, during the year 1893, and up to January 12, 1894, also the dates upon which the transportation was furnished, and places to which paupers were claimed to have been sent, and the amount paid for transportation. This statement was made up from the claims introduced in evidence, which aggregated more than five hundred. The records from the ticket offices were necessarily long, and somewhat complicated, as they covered the ticket sales of the different offices for the period of nearly one year. It is said that these exhibits were not the best evidence; that they were secondary, hearsay, and incompetent. It is no doubt true that they were not substantive evidence tending to establish either the number or amount of claims filed by the defendant, nor of the number of tickets sold by the different railway companies. They were simply tabulated statements, made by competent persons, taken from voluminous and numerous claims and records which were already in evidence, made for the purpose of assisting the jury in arriving at their verdict. As such, they were competent. State v. Cadwell, 79 Iowa, 432, 44 N. W. 700; 1 Rice on Evidence, 237; Von Sachs v. Kretz, 72 N. Y. 548; Bradner on Evidence, 308–310; Casey v. Ballou Banking Co., 98 Iowa, 107, 67 N. W. 98; 2 Rice on Evidence, 745, 746, and cases cited."

In Jordan v. Warner's Estate, 107 Wis. 539, 83 N. W. 946, the Supreme Court of Wisconsin quoted the rule as given above from Jones on Evidence as sustaining this character of testimony; the court saying:

"It is sufficient to say, as to most of the rulings on evidence, that, right or wrong, they did not affect the final result, because the evidence to which they were directed clearly did not vary or materially add to the evidence received without objection. Under this head the ruling most relied upon as prejudicial error appears to be that which resulted in admitting the evidence of John Bottensek and some tabulated statements prepared by him, showing the lands sold by Warner, the consideration received for each specific tract, as indicated by the records of deeds in the office of the register of deeds for Outagamie county, also showing the amount of tax claims acquired by Warner as to each tract of land, that information being gathered from the tax rolls from the years 1889 to 1894, inclusive. All the records from which the tabulated statements were compiled were before the court. The witness testified that he prepared the statements from a personal examination of the books and that he believed them to be true. Appellant's counsel had ample opportunity to cross-examine the witness and to inspect the books, and thereby test the credibility of the evidence. It can readily be seen that it was impracticable to produce and spread upon the record of the trial the history of each one of the large number of tracts of land to which the evidence referred. Respondents' counsel proceeded in that situation by a method well recognized as proper. Instead of reading in evidence the material portions of the numerous books containing the multitude of items, he produced the books and then gave from the mouth of a witness who had personally examined them a summary of the material facts, and put in, as part of such witness' evidence, tabulated statements thereof. The statements were not received as original evidence but as part of the witness' evidence."

In San Pedro Lumber Co. v. Reynolds, 121 Cal. 74, 53 Pac. 410, Justice Henshaw, speaking for the Supreme Court, sustained the admission of this character of testimony, saying:

"The expert Lutgen, when on the witness stand, presented certain schedules which he testified were summarizations of what the books showed. By these schedules appeared shortages and defalcations to the amount sued for. It is insisted by appellants that they were not admissible. In Burton v. Driggs, 20 Wall. 136 [22 L. Ed. 299], it is well said: 'When it is necessary to prove the results of voluminous facts, or of the examination of many books and papers, and the examination cannot be conveniently made in court, the results may be proved by the person who made the examination. Here the object was to prove, not that the books did, but that they did not, show certain things. The results sought to be established were not affirmative, but negative. If such testimony be competent as to the former, a multo fortiori must it be so to prove the latter.' Says Greenleaf (1 Greenl. Ev. § 93): 'A further relaxation of the rule has been admitted where the evidence is the result of voluminous facts, or of the inspection of many books and papers, the examination of which could not conveniently take place in court.'"

On the facts shown in appellant's fourth bill of exception copied above, we believe this testimony is admissible.

[2] By his third assignment of error, complaint is made of the admission of the following testimony:

"Q. What was the value of that business when you turned it over to Mr. Cochran (referring to the business of Tolar N. Hamblen & Co.)? A. I would say around $14,000."

Appellant objected to this testimony on the ground that it was the statement of a conclusion of the witness, and that whatever volume of business was done by him would be reflected by the books kept by him, and the books would be the best evidence. It is not shown by a statement under this assignment, nor by a reference to the bill itself, that the books were not introduced, nor are the circumstances of the admission of

this testimony shown by the bill; the bill in full being as follows:

"Be it remembered that, upon the trial of the above entitled and numbered cause, while the plaintiff, Tolar N. Hamblen, was on the stand testifying in his own behalf, and after the said plaintiff had testified that he kept books of the insurance business of Tolar N. Hamblen Company conducted by him during the year preceding the date that said business. was. turned over to the defendant, J. B. Cochran, the witness was permitted by the court to testify in answer to the question propounded by counsel for plaintiff, as follows:

"Q. What was the volume of that business when you turned it over to Mr. Cochran? A. I would say around $14,000.

"(To which question to the witness and answer of the witness counsel for the defendant objected, and asked that said question and answer be stricken out, for the reason that it was purely a statement of the conclusion of the witness, and that whatever volume of business was done by him would be reflected by the books kept by him, and that the books would be the best evidence. The court having overruled said objections, the defendant then and there in open court excepted, and for as much as the matters and things above set forth are not of record, he tenders this his bill of exception No. 3, and prays that the same may be signed by the court and made a part of the record herein, which is here now done, this ―――― day of January, 1918.)"

On the facts shown in this bill of exception, we believe this testimony admissible, especially so in view of the facts shown in the fourth bill of exception just above discussed. The authorities cited above will sustain the admission of this testimony.

[3] Appellant's second assignment of error is as follows:

"The court erred in instructing the jury to return a verdict for plaintiff as requested by plaintiff, after the plaintiff had withdrawn his announcement of ready for trial, and the case had been continued for the term."

As shown by bill of exception duly reserved by appellant, upon the trial of this cause, and at the conclusion of the evidence, the jury was excused until 2 o'clock p. m. of the same day, November 16, 1917, and the court proceeded to hear argument of the attorneys in the case upon the propriety of giving to the jury an instructed verdict for plaintiff, as requested by plaintiff, and after the discussion had proceeded for about three hours the court informally advised counsel that he was of the opinion that plaintiff was not entitled to the instruction requested by him, and that his pleading was not so framed as to give him all the relief he was entitled to recover in the case. Thereupon counsel for plaintiff stated to the court that by the attitude of the court he would be compelled either to take a nonsuit, or withdraw his

announcement of ready, and amend his petition, and continue the case. The court stated that he would allow the plaintiff to withdraw his announcement of ready and allow the plaintiff to amend and continue the case (counsel for defendant consenting thereto), and the court stated that the case was continued to the next term; it being at this time during the noon hour. And the clerk, having gone to lunch, leaving the court docket locked up where it was not available, the court announced ·that he would make the proper entry on the docket at 2 o'clock showing that plaintiff was allowed to withdraw his announcement of ready for trial, and granting him leave to amend his petition, and continue the case for the next term.

At 2 o'clock p. m. the jury reconvened in court pursuant to the order excusing them until that hour, whereupon the court (never having made such entry on the docket) announced to counsel for both parties that further reflection led to the conclusion that the jury should be instructed to return a verdict for the plaintiff as requested by plaintiff, whereupon the court proceeded to instruct the jury to return a verdict for plaintiff in the sum of $2,455.

It does not appear from any statement in the bill of exceptions, or by any reference to the record, that appellant suffered any injury by this action of the court. The jury had not been discharged, and it was clearly within his discretion to change his ruling on this issue. In the absence of a clear showing of injury, appellant has no complaint.

[4] Appellant's first assignment of error is that the court erred in instructing a verdict in favor of plaintiff below in the sum of $2,455.

The first proposition under this assignment is that the credibility of a witness is a question for the jury, and it was error for the court to assume the truthfulness of the unsupported testimony of the plaintiff, Tolar N. Hamblen.

As an abstract proposition of law, this proposition is correct, and is fully sustained by the following authorities: First National Bank of Plainview v. McWhorter, 179 S. W. 1148; Heierman v. Robinson, 26 Tex. Civ. App. 491, 63 S. W. 658; Rayner v. Posey, 173 S. W. 249, and cases cited therein; Burleson v. Tinnin, 100 S. W. 351; I. & G. N. v. Johnson, 23 Tex. Civ. App. 160, 55 S. W. 791; Sonnenthiel v. Christian Moerlein Brewing Co., 172 U. S. 408, 19 Sup. Ct. 236, 43 L. Ed. 495.

As we view the record in this case, as disclosed in the statement made by us, and in the statements made under the assignments above discussed, plaintiff's testimony was not unsupported. In estimating the compensation to be paid plaintiff under the fifth paragraph of the contract, it must have been in

the contemplation of both parties that plaintiff's books would have to be used by them in determining 10 per cent. of the gross premiums of all old business brought into said Cochran Insurance Agency by the plaintiff. We see no way by which the amount of this old business could have been determined except by plaintiff's books. The record shows that these books were introduced before the jury. While it does not show the extent of the use of the books on the trial, there is nothing to show that appellant and his attorneys were denied the free use of them in the cross-examination of appellant, or that the jury was denied the use of them in its deliberations. Under the assignments above discussed, it appears that plaintiff testified fully as to the contents of these books, a statement showing the contents of the books was offered and received, and the books themselves were duly offered and received as testimony. We believe that the testimony of plaintiff was sufficiently corroborated to warrant the court in instructing the jury as to the value of old business, as set out in section 5 of the contract. Plaintiff's testimony as to the amount of the wages due him for the balance of the contract period in the sum of $1,000 is fully sustained by the entire record, and no assignment is made as to the sufficiency of the testimony to sustain the balance of unpaid salary as set out in the contract. The total value of the amount of gross premiums of old business slightly exceeded $1,500; but, plaintiff having alleged the value and. amount at $1,500, this could not be exceeded by the trial court. The testimony further shows that plaintiff earned $45 after he ceased working for the defendant, and, while it does not affirmatively appear that this $45 was taken into account by the court in fixing the sum assessed by the jury under his direction, an analysis of the testimony shows that he must have done so. It clearly appears from the total sum of $2,455, that this was made up by the $1,000 unpaid salary and $1,500 value of old business, less $45 earned by plaintiff. In his statement of the case under this assignment, appellant does not question the amount earned by plaintiff after he ceased working, but stated to the court, in his oral argument, that no issue was made as to this $45. Further, no assignment is made against this total sum of $2,455 that it does not appear how the court arrived at the same, except in so far as appellant criticizes the testimony as to the value of old business. In the statement heretofore made by us, we show a detailed statement of the different items making up the sum in excess of $1,500. Hence, we cannot sustain appellant's first proposition.

[5, 6] Appellant's second proposition under this assignment is that the instructed verdict in favor of plaintiff for $2,455 given by the court is wholly unsupported by any evidence, and should not have been given.

In so far as this assignment refers to the testimony as to the amount of damages shown for the unpaid salary and for the value of the old business, what we have said under the first proposition disposes of this second proposition. However, appellant advances the further argument under this assignment that there is no testimony to show a breach of the contract sufficient to warrant the court in assuming that plaintiff had been discharged. Appellant raises the same legal question in his third proposition, which is that as to two material issues of fact; that is, as to the amount upon which the 10 per cent. on gross premiums should be computed, and, as to whether or not the defendant Cochran had in fact discharged the plaintiff Hamblen, the evidence was conflicting; and the court should not have directed a verdict in favor of the plaintiff, Hamblen.

We cannot agree with appellant that there is any conflict in the testimony. as to the value of old business. We think that the court was warranted in instructing the jury as to the value and amount of the gross premiums as·shown. by the books of the plaintiff.

In order to sustain an instructed verdict on the question of discharge, we will have to assume as true the appellant's testimony. If his version of why plaintiff quit working for him does not in law amount to a discharge, then the court improperly directed a verdict so far as the salary item is concerned. We here repeat in full appellant's statement of the difference between him and plaintiff:

Cochran: "Tolar, you have not been producing anything like you represented your ability to produce, and have not been producing any results. You have done substantially nothing."

Hamblen: "I just cannot do any better."

Cochran: "You certainly do not want to be paid when you are not doing anything."

Hamblen: "Oh, yes, I do! I cannot produce that amount of business and I know it, but I have a contract in which you have to pay me for the year."

Cochran: "Is that the way you look at it?"

Hamblen: "Yes, that is the way I look at it. So far as that contract is concerned, if ' I write $12,000 in premiums on the last day of the year, that would average $1,000 per month."

Cochran: "Suppose you did not write it?"

Hamblen: "You would get stuck."

Cochran: "Is that the way you look at it?"

Hamblen: "Yes, that is the way I look at it."

Cochran: "It looks like you want to perpetrate a fraud."

Hamblen: "You can take it that way if you want to."

Cochran: "There is not anything in the contract that says when I will pay you anything at all. I will simply wait to see when you deliver your end of the contract and I will deliver mine."

Under all the authorities, as we construe them, the failure of appellant to pay plaintiff's past-due salary was a breach of the

contract, and gave to plaintiff a cause of action for his past-due salary and justified plaintiff in rescinding the contract and in refusing to work any longer under the same. Wheaton v. Higgins, 90 N. Y. Supp. 1041; Barnett v. Cohen, 110 N. Y. Supp. 835; Porter v. Arrowhead Reservoir Co., 100 Cal. 500, 35 Pac. 146; Cox v. McLaughlin, 52 Cal. 590; Id., 63 Cal. 196; Id., 76 Cal. 60, 18 Pac. 100, 9 Am. St. Rep. 164; Elliott on Contracts, §§ 2042, 2108, 3690.

While these authorities sustain the rule that a failure to pay salary as per contract is a breach warranting rescission on the part of the plaintiff, they uniformly announce the rule that the nonpayment of past-due wages is not tantamount to a discharge.

In Wheaton v. Higgins, supra, it is said:

"Nonpayment of wages for the prior month was not tantamount to a discharge, and the recovery should have been limited to the actual wages earned."

In Barnett v. Cohen, supra, it is said:

" * * * Upon the facts as testified to by the plaintiff, he left the defendant's employ, not because he was * * * told to leave by defendant, but because the latter refused to pay him the balance of $180 apparently concededly due plaintiff at the time when he ceased working for defendant.

"The plaintiff was clearly justified in his refusal to continue to work for the defendant upon the defendant's failure to observe his obligation of payment (Johnson v. Tyng, 14 App. Div. 270, 43 N. Y. Supp. 435); but that is quite a different proposition from holding that such a breach on the part of defendant was tantamount to a discharge"—citing Wheaton v. Higgins, supra).

"The plaintiff could have continued in defendant's employ and brought suit to recover the amount due him, or he may have rescinded the contract and refused to work thereunder"—citing Wharton v. Winch [140 N. Y. 287], 35 N. E. 589.

The case of Cox v. McLaughlin, supra, was before the Supreme Court of California many times. In Porter v. Arrowhead Reservoir Co., supra, reviewing this old Cox-McLaughlin Case and many other decisions, the court said:

"Prior to the decision of Cox v. McLaughlin, reported in 76 Cal. [60], 18 Pac. [100, 9 Am. St. Rep. 164], supra, this court repeatedly and always held that, unless McLaughlin's prevention of the execution of the contract by Cox was alleged and found as a fact, plaintiff was not entitled to recover on the contract; and the court further held that a mere failure or refusal to pay an installment upon the contract price as it became due was not a condition precedent in the contract, was not prevention, and did not authorize the plaintiff to abandon the work, and recover the profits he would have made if the work had been completed under the contract. Under the last decision (76 Cal. 60, 18 Pac.

[100, 9 Am. St. Rep. 164]) the complaint had been amended. The contract was no longer relied upon, and for the first time the action was before the court upon a quantum meruit, and it was then sustained. There was no question of 'prevention' involved in the case upon that appeal. That element is not considered in the opinion of the court; but a failure to pay an installment of the money due was necessarily held a breach of the contract, for without a breach there could have been no action of quantum meruit, and necessarily no recovery had thereon. There is a wide distinction between 'prevention' upon the part of the employer of the further carrying on of the work, and other breaches of the contract. The law says breaches amounting to prevention must be of conditions precedent, and the payment of an installment upon the contract price is not such a condition, as Cox v. McLaughlin repeatedly decides. At the same time, that case conclusively holds that a default in payment is such a breach as to justify a rescission and an action of quantum meruit, and that long litigation was concluded upon that principle. There is no question but that nonpayment, as agreed upon, is a breach of the contract, of some character; and Justice McKinstry said in the 54th Cal., supra [Cox v. McLaughlin, 76 Cal. 60, 18 Pac. 100, 9 Am. St. Rep. 164]: 'Assuming that the failure to pay, as alleged, constituted a breach of the contract, the plaintiffs could have treated the specific contract as rescinded, and have brought suit upon the implied promise of defendant to pay the value of the work actually done.' And in the very case of Palm v. Railroad Co., 18 Ill. 219, from which Justice McKinstry quotes in extenso to establish that nonpayment does not amount to prevention, the Illinois court said: 'The contract provides for no other penalty or liability, and the law imposes no other, except perhaps that this violation of the contract by the defendant, in failing to make the payment, may justify the plaintiff in treating the contract as rescinded, and in suing for the amount due, in an action for goods sold and delivered.' In Schwartz v. Saunders, 46 Ill. 18, the owner failed to pay the contractor in the erection of a building an installment of the contract price, when due, and the court said: 'That he had a right to abandon the work, under the circumstances, seems a proposition so plain as to require no argument.' A failure to pay an installment of the contract price, as provided in the contract, is a substantial breach of the contract, and gives the contractor the right to consider the contract at an end, cease work, and recover the value of the work already performed. As we have seen, Cox v. McLaughlin is authority to support this principle, and there is also ample precedent from the decisions of the courts of other states. Canal Co. v. Gordon, 6 Wall. 561 [18 L. Ed. 894]; Evans v. Railroad Co., 26 Ill. 189; Preble v. Bottom, 27 Vt. 249; Dobbins v. Higgins, 78 Ill. 440; Shaw v. Turnpike [Pa.] 3 Pen. & W. 445; Reybold v. Voorhees, 30 Pa. St. 116; School Dist. v. Hayne, 46 Wis. 511, 1 N. W. 170."

Hence, we conclude that there is not sufficient evidence in this record to warrant the court in instructing a verdict which must be sustained on the theory that plaintiff had

been discharged, and, in so far as the second and third propositions relate to the recovery of the balance due on the salary feature of the contract, they are sustained. As relating to the value of the old business, they are overruled. The testimony is clear as to the value of this business, and, under appellant's own statement, he breached the contract because plaintiff was not producing $1,000 per month new business. The contract provided, in the event that plaintiff failed to produce $1,000 a month new business, that appellant should pay 10 per cent. of the amount of old premiums. He could have waited until the end of 12 months to see whether plaintiff was able to produce this amount of new business, but he chose not to do so. He anticipated by 6 months this feature of the contract, and, so far as the value of old business is concerned, appellant was in identically the same position at the end of 6 months as he would have been had he waited until the expiration of the contract. According to his own statement, he has not delivered to plaintiff any portion of the profits of the Cochran Insurance Agency, nor has he recognized plaintiff as a partner since the breach of. the contract, and thus all the facts which would have made plaintiff liable for the value of the old business at the end of the year existed at the time the contract was breached, and the court correctly instructed a verdict as to this amount.

[7] Appellant's fourth proposition under this assignment is that the pleadings of the plaintiff are not sufficient to sustain a finding that plaintiff was wrongfully discharged.

We think this proposition is well taken. There is no allegation that plaintiff was discharged, nor that appellant refused to let him work. All that plaintiff alleges is that appellant refused to pay him one month's salary and the past-due portion of two months' salary, and that he notified plaintiff that he would not pay him in the future. As already stated by us, this constituted a breach, but not in law a discharge. In order to make the pleadings sufficient on these allegations, it must be further made to appear that in refusing to pay the past-due salary and the future salary that appellant intended it as a discharge, and further that appellee was forced to use his current salary for living expenses; that he had no other means of supporting himself; that this was known by appellant; and that appellant knew that a failure on his part to pay plaintiff's salary as it accrued would force plaintiff to seek other employment; or other allegations showing the legal effect of this refusal to pay salary to amount in law to a discharge.

For the errors indicated, this cause is reversed and remanded as to the sum of $955, being that portion of the instructed verdict based on the salary account, and is affirmed as to $1,500, being that portion of the instructed verdict based on 10 per cent. of the amount of old premiums.