STATE OF IOWA, Appellee, v. D. A. DOBRY, Appellant.

No. 41396.

OCTOBER 24, 1933.

REHEARING DENIED APRIL 5, 1934.

Joseph B. Lawler, and Chamberlin & Chamberlin, for appellant.

Edward L. O'Connor, Attorney-general, Clair E. Hamilton, Assistant Attorney-general, and Leon A. Grapes, County Attorney, for appellee.

ALBERT, C. J.— The D. A. Dobry Securities Company was an Iowa corporation, of which the defendant was the president. For the purpose of securing permission to issue additional securities, on the 27th day of January, 1931, the defendant signed and verified a written statement filed with the secretary of state, the substance of which was to show the financial condition of said corporation at that time, and it is as to statements made in such writing, which were false, that this accusation was brought.

The case was tried and submitted to the jury on the theory that if the statement was, in fact, false, this was sufficient to violate the statute. The contention of the defendant is that the statement must be knowingly false in order to violate the statute.

The question, therefore, is narrowed to the single proposition of whether or not the statement must be "knowingly false." Many authorities have been cited, together with some of our own cases on this proposition of the definition of the word "false." An investiga-

tion of those cases, however, in the light of the statutes under which they are decided, is of little use or value to us in the determination of the question before us. For a fair understanding of this proposition it is necessary to refer to the statute under which this indictment was brought and its purpose and history.

The statute under which this indictment was returned was passed by the legislature of this state in 1915 and appears as section 20, chapter 149, of the Acts of the Thirty-sixth General Assembly, and appears now in the Code of 1931 as section 8581-c21. The material part thereof in which we are interested is as follows:

"Any person, firm, association, company or corporation * * * that shall * * * make or subscribe to any false statement, exhibit or paper filed with the secretary of state, * * * or shall make to said secretary of state, his superintendent, agent or representative any false statement as to the financial condition of such person, firm, association, company or corporation shall be deemed guilty of a felony * * *."

It will be noticed that the term used here is "false statement." This section appears in what is known as the "Blue Sky Law" or the "Iowa Securities Act," and is chapter 393-C1 of the Code.

It might be well first to consider the purpose intended to be accomplished by this act. It is well known that this state in times past has been flooded with worthless securities, and that there are people who have thus been defrauded. It was the intention of the legislature in passing this act to avoid this situation. A study of the act shows that securities could not be issued by corporations in this state without first obtaining permission from the secretary of state, and, in order to obtain such permission, written statements provided for in the act were required to be made by the corporation or its officers, sworn to prior to having been filed with the secretary, and it was for the secretary of state to determine, under the showing made, the good faith and financial stability of the corporation thus wishing to issue such securities. As one of the provisions of said act, the above-quoted section of the Code was made to aid the purpose of the act.

The first act passed by the General Assembly of this state was by the Thirty-fifth General Assembly (1913), chapter 137, and section 10 thereof is the section in that act treating with the same subject of false statements as section 20 of the present act. The afore-

said act of the Thirty-fifth General Assembly was held invalid by the U. S. District Court. Compton Co. v. Allen, 216 F. 537. Thereafter the original law, with numerous changes, was re-enacted in the aforesaid chapter 149 of the Thirty-sixth General Assembly. Section 10 of the original act provided that any company, or person, who shall *knowingly* and *wilfully* subscribe to or cause to be made any false statement or false entry in any book of such investment company, or exhibit any false paper with intention to deceive any person authorized to examine the affairs of said investment company, or shall *knowingly* or *wilfully* make or publish any false statement of the financial condition of the investment company, or the stocks, bonds, or other securities by it offered for sale, shall be deemed guilty of a felony.

It will be noticed on comparison of the last-quoted section with the previous section dealing with the same subject that the present statute makes it a felony to make or subscribe any "false" statement, while the original act provided that any person who shall "knowingly and wilfully subscribe or cause to be made any false statement, or shall knowingly or wilfully publish any false statement" shall be deemed guilty of a felony.

The distinguishing feature between the two acts, therefore, is that under the original act the term "false statement" was qualified by the use of the terms "wilfully and knowingly" and that, under the present act, those qualifying terms are omitted. It is suggested in argument that these qualifying terms were omitted by inadvertence, but with this conclusion we cannot agree. We are supported in this conclusion, in part at least, by the subsequent section of the present statute. Section 8581-c23 deals with the sale of these stocks through agents or representatives, and it provides that any such agent who shall "knowingly make any false representations or statements as to the nature, character or value of such security * * * or knowingly violate any of the provisions of this chapter with intent to defraud, shall be deemed guilty of a felony * * *."

It is apparent that the legislature had this term "knowingly" before it in the preparation of this law, and the fact that it used it in the last-quoted section would naturally carry with it the idea that it purposely omitted it in the first quoted section.

There are certain rules of construction of statutes that must be considered in determining this question. In finding what shall constitute a crime, the legislature has unlimited power. In other words,

they can make it include certain elements or omit certain elements therefrom as in their judgment seems best.

We had before us, in State v. Dunn, 202 Iowa 1188, 211 N. W. 850, a similar question. We there said:

"It is quite universally recognized at this day that the legislature may forbid the doing of an act and make its commission a crime without regard to the intent or knowledge of the doer. Whether a criminal intent or guilty knowledge is an essential element of a statutory offense is to be determined as a matter of construction from the language of the act, in connection with its manifest purpose and design."

It is a fundamental rule of construction that where the legislature has purposely omitted words the courts have no power to supply them, and this is especially true in criminal cases. Snowden v. Thompson, 106 Ark. 517, 153 S. W. 823; In re Haines, 68 Cal. App. 522, 229 P. 984; California Telephone & Light Company v. Jordan, 19 Cal. App. 536, 126 P. 598; Fouracre v. White, 7 Boyce (30 Del.) 25, 102 A. 186; State v. Board of Commissioners, 175 Ind. 400, 94 N. E. 716; Morse v. City of Boston, 253 Mass. 247, 148 N. E. 813; Thacher v. Secretary of Commonwealth, 250 Mass. 188, 145 N. E. 256; King v. Viscoloid Company, 219 Mass. 420, 106 N. E. 988, Ann. Cas. 1916D, 1170; In re Algoe, 74 Neb. 353, 104 N. W. 751; State ex rel. Mickey v. Reneau, 75 Neb. 1, 104 N. W. 1151, 106 N. W. 451.

From a history of this legislation, as heretofore set out, it cannot be said that these words "knowingly" and "wilfully" were omitted unintentionally from the statute by the legislature, but, on the other hand, we think that they were purposely omitted.

We conclude, therefore, that the theory on which the court tried the case and instructed the jury in reference to knowledge on the part of the defendant was correct.

 The written statement in question is known in the record as "Exhibit C." The defendant, together with certain other parties, met at the office of the superintendent of the securities department in Des Moines, shortly after this writing had been filed with the department, and on presentation of the same to the defendant, he stated: "Why, this is a mistake. These figures can't possibly be right." One of the parties present at that meeting testified that Huebner (the superintendent) asked if the earnings statement was

correct, and the defendant said, "It is not correct," and that the company had no earnings for 1929 such as that. The state's testimony further shows that the superintendent then told the defendant that he wanted the company checked up, and the defendant said that it would "just blow up the company," because of previous examination by the Illinois securities department. Nevertheless, over the protest of the defendant, Knudsen (one of the employees of the state securities department) went to Davenport for an examination of the company. Knudsen testified: "Dobry didn't want the examination made, as he said it would blow the company up." Knudsen did not see the defendant when he arrived to make the examination. He commenced to examine the books and records of the Dobry Securities Company about the 23d, 24th, or 25th of February, A. D. 1931. He testified: "I went to the office of D. A. Dobry Securities Company on the fourth floor of the Kahl building, and asked to see their records, and began an examination of their books and records that were offered to me. I was working on this examination about two and a half weeks. I examined the books and records of the D. A. Dobry Securities Company for the years 1929, 1930 and 1931. I did not find the journals and books of original entry of the company for the year 1929. I made a request of Mr. Ring, the auditor, and Mr. Dobry, president of the D. A. Dobry Securities Company, and then a search was made for them and to my knowledge they did not produce them to me. I talked to Mr. Dobry and told him I was unable to locate the books and he made another search and said the office had been robbed a couple of times and evidently they had been stolen. I examined the general ledger for the year 1929; that was all. As to 1930, I examined the general ledger and books of original entry, in the office of the D. A. Dobry Securities Company. Dobry was there during some part of the examination. Since that examination I have made other examinations of the books and records of the D. A. Dobry Securities Company, about April, 1931. . I made a check of the books for the years 1929 and 1930. When I went to the office of the D. A. Dobry Securities Company, I would see Mr. Dobry possibly two days a week while I was there. When Mr. Dobry was there I went to Mr. Ostrem and I went to Mr. Dobry, too. He saw me working on the books and he never told me to get out. I talked to Mr. Ostrem and Mr. Dobry both about the books. I requested specifically of Mr. Dobry that I should be furnished certain books which were not. I advised Mr. Dobry (at the meeting)

in Des Moines that I wanted to make an examination of this kind. I came down here with his knowledge. When I came they gave me a room. The books were brought in as I called for."

The 'above record is set out because of the fact that the defendant urges that the books are not in the handwriting of the defendant, nor were they made under the direction of the defendant, and the defendant had no knowledge of their contents, and consequently it is urged that the books of account of D. A. Dobry Securities Company were not admissible in evidence against the defendant. It is argued that the books were not admissible in evidence because it is not shown that they were made in the ordinary course of business and no one testified that they were true and correct; and it is further urged that the general ledgers were not admissible in evidence because they were not books of original entry. We think that, while numerous Iowa cases are cited on these respective propositions, none of them has any application to the situation before us. It was known by the defendant that this examination was to be made of the books of his corporation. The examiner went into the offices of that corporation to make this examination, and Dobry was there on various occasions and was solicited at different times to produce different books. While there is no direct evidence that Dobry himself handed any of these books to the examiner, we think that this failure of evidence is immaterial in the light of the record as made. Difficulties having arisen by the dispute between the securities department of the state and this corporation, and the defendant knowing that the books of the corporation were to be examined, which examination was conducted in the offices of the defendant, the defendant being present when the examination was conducted, was sufficient to overcome the objection lodged against the introduction of such books in evidence in this case, and the other objections made thereto. The examiner made a tabulated statement and a summary of the books thus introduced in evidence, and this was admitted by the court in evidence. We think this was a proper procedure, as we have the books before us and find that it would be a useless and senseless proposition to expect the ordinary jury to utilize half a wagonload of books and make any reasonable deductions therefrom.

Professor Wigmore, in the second volume of his work on Evidence, section 1230, makes a very succinct statement of the rule in such matter. He says:

"Where a fact could be ascertained only by the inspection of a large number of documents made up of very numerous detailed statements * * * it is obvious that it would often be practically out of the question to apply the present principle by requiring the production of the entire mass of documents and entries to be perused by the jury or read aloud to them. The convenience of trials demands that other evidence be allowed to be offered in the shape of the testimony of a competent witness who has perused the entire mass and will state summarily the net result. Such a practice is well established to be proper."

As sustaining this statement of Wigmore, see State v. Cadwell, 79 Iowa 432, 44 N. W. 700; State v. Brady, 100 Iowa 191, 69 N. W. 290, 36 L. R. A. 693, 62 Am. St. Rep. 560; State v. Niehaus, 209 Iowa 533, 228 N. W. 308.

We think there was no error in the ruling of the court on this matter.

It is next urged that during the argument of one of defendant's counsel the judge was absent from the courtroom, but at all times remained within immediate call. We do not think that under the record made in this case this conduct on the part of the judge was prejudicial. While defendant's counsel was arguing, he certainly would not want to make any objection or raise any question which could call for a ruling of the court. The record, in fact, does not show that there was any effort on the part of defendant to raise any such question during the time of his argument, and there is nothing in the record to show that the absence of the judge resulted in any prejudice to the defendant. A similar condition existed in the case of State v. McGee, 207 Iowa 334, 221 N. W. 556, and we therefore find nothing in this exception prejudicial to the defendant.

It is further urged that the prosecuting attorney indulged in certain improper argument. We have read the record in this respect and do not agree with the contention made by the defendant. When the court's attention was called to this matter, the objectionable remarks (if they were objectionable) were stricken out by the court and the jury told to disregard such remarks. We think there was nothing prejudicial here to the rights of the defendant.

It is further urged that the court should have sustained the motion to instruct the jury to return a verdict of not guilty. We have

read the record with care, and are satisfied that the court's conduct in refusing such instruction was proper.

We think, on all phases of the case, there was a question for the jury, and after a careful review of the whole record, we conclude that the defendant had a fair and impartial trial.—Affirmed.

STEVENS, KINDIG, CLAUSSEN, KINTZINGER, and ANDERSON, JJ., concur.

EVANS, J., dissents.

MITCHELL, J., joins in dissent.

EVANS, J. (dissenting)—I am unable to concur in the majority opinion. The defendant was prosecuted under an indictment, which charged him with the violation of section 8581-c21 of the Code of 1931, which is as follows:

"*False statements, entries, and representations.* Any person, firm, association, company or corporation subject to the provisions of this chapter, that shall subscribe or ·cause to be made any *false statement* or *false entry* in any book required to be kept or relating to any business to be transacted in this state pursuant to the provisions of this chapter, or make or subscribe to any *false statement,* exhibit or paper filed with the secretary of state, or shall make to the secretary of state, his superintendent, agent or representative any *false or fraudulent statement* concerning the proposed plan of business to be transacted, or the nature, value or character of securities to be sold in this state, or shall make to said secretary of state, his superintendent, agent or representative any false statement as to the financial condition of such person, firm, association, company or corporation shall be deemed guilty of a felony, and upon conviction shall be fined in the sum of not more than five thousand dollars, or imprisoned not to exceed five years in the penitentiary or reformatory, or by both such fine and imprisonment in the discretion of the court."

It will be noted from a reading of the above statute that it makes no reference in terms to the *intent* or *knowledge* of the person charged with violation thereof. The jury could have found from the evidence in the record that the defendant believed the statement signed by him to be true, when he signed it, and that he had no in-

tent to deceive. The position of the state is that the knowledge and intent of the defendant in the signing of such statement were immaterial. This contention is predicated upon the fact that the words "knowledge" and "intent" are not contained in the statute itself and that their absence therefrom evinced the legislative intent to eliminate those subjects as elements of the crime charged. Consistent with such view the jury was instructed on the trial that it was not available to the defendant to show in defense that he believed the statements signed by him to be true. The question therefore arising at this point is: May an act of the defendant be deemed "false" and "fraudulent" though without *scienter* and without intent to deceive? The position of the defendant is that *knowledge* of falsity and *intent* to deceive inhere in the statutory terms "false" and "fraudulent". In other words, if the statement signed by the defendant was false and fraudulent, it was so because it was knowingly made with fraudulent intent. In the absence of knowledge and intent the statement could not be fraudulent in a legal sense. If the plaintiff had chosen to prosecute a civil action at law for damages against the defendant for the alleged false and fraudulent statements, it would be incumbent upon him without any doubt, to prove the *scienter*.

May the defendant be found guilty of the felonious crime of making false and fraudulent statements, upon less proof than is required to establish liability in a civil action? If a defendant be charged with making false and fraudulent statements, what is the nature of the proof required to establish such a charge? Can falsity or fraud be established without proof of *scienter?* Does not *scienter* of the wrongdoer inhere in the very essence of fraud? The state relies for authority in support of its contention upon State v. Dunn, 202 Iowa 1188, 211 N. W. 850, and Jamison v. Burton, 43 Iowa 282. What was held in the Dunn case was that the legislature has power in the proper case to dispense with knowledge and intent as an element of the crime charged. This doctrine is sometimes invoked in aid of the police power of the state. It is applied to cases where a duty to be performed is created and where the failure to perform the duty constitutes the essence of the charge. The pronouncement is one which in its very nature can operate only in a limited field. It is exceptional in character rather than general, and is to be applied in any case with caution, bearing in mind at all times that evil intent is usually the heart of the felonious crime. "False" and "fraudu-

lent" comprise the incriminating terms of the above statute. These terms imply evil intent and moral turpitude as a part of their definition. Indeed, these implications constitute their only definition. A "fraudulent representation" is one made with guilty *scienter* and intent to deceive. No other definition is possible. To eliminate guilty *scienter* and intent from the definition of a fraudulent representation is to leave the term without any definition at all. What we said in the Dunn case, relied on by the state, was the following:

"Whether a criminal intent or guilty knowledge is an essential element of a statutory offense is to be determined as a matter of construction from the language of the act, in connection with its manifest purpose and design."

Jamison v. Burton, 43 Iowa 282, relied on by the State, was a civil action to recover for the benefit of the school fund a penalty for the sale of intoxicating liquor to a minor. In construing the statute we held that knowledge of the *minority* on the part of the defendant was not a necessary element of the charge. This holding was put upon the ground that the sale of intoxicating liquors was under a "general inhibition" and that its legality was *exceptional* and that the liquor vendor was bound to know whether he was within the permission of the statute. The final sentence of the opinion is:

"When one sells intoxicating liquors, he must know at his peril whether or not a lawful sale can be made to the purchaser."

This case has no bearing whatever upon the question before us. It will be noted that the crime defined in the above section carries a maximum punishment of five years in the penitentiary, and a fine of $5,000. It is the contention of the State that the term "false statement" as used in the statute means no more than that the statement *is not true;* and that it is immaterial whether the untrue character of the statement is the result of mistake or inadvertence, or not. The State resists the idea that a "false statement" within the meaning of the statute carries any implication of an intent to deceive.

We had this question before us in Hatcher v. Dunn, 102 Iowa 411, 71 N. W. 343, 36 L. R. A. 689. That case was a civil action for damages against a state inspector of oils on his official bond wherein the inspector was charged with having *falsely* branded a certain barrel or package of oil. The trial court instructed the jury

that the defendant was liable for the wrong branding, if such, and was so liable regardless of his knowledge or intent. We said:

"It is important to determine the meaning which should be attached to the word 'falsely', as used in the statute. Does it mean inaccurate, erroneous, or faulty, merely, or does it include the thought of intentional wrong? It is true that a false branding may be said to be inaccurate, erroneous, faulty; but the word 'false' usually includes, not only the element of error, but also of intentional wrong. It is said in 7 Am. & Eng. Enc. Law, 661, that 'this word means something more than untrue; it means something designedly untrue, deceitful, and implies an intention to perpetrate some treachery or fraud.' See, also, Putnam v. Osgood, 51 N. H. 192-206; State v. Smith, 63 Vt. 201, 22 A. 604; Clapp v. Association, 146 Mass. 519, 16 N. E. 433, 436; Mason v. Association, 18 U. C. C. P. 19; Franklin Insurance Co. v. Culver, 6 Ind. 137; Cohn v. Neeves, 40 Wis. 393. See, also, State v. Brady, 100 Iowa 191, 69 N. W. 290 [36 L. R. A. 693, 62 Am. St. Rep. 560]. The statute under consideration makes the officer who violates its provisions liable both civilly and criminally upon precisely the same state of facts, and is therefore a penal statute, to be strictly construed. Hanks v. Brown, 79 Iowa 563, 44 N. W. 811, and cases therein cited; Suth. St. Const., sections 208, 371."

The question has been often considered in other jurisdictions.

In People v. Luchetti, 119 Cal. 501, 51 P. 707, the Supreme Court of California discussed this question as follows:

"The word 'falsely' as used in the statutory provision that if a witness has, in the opinion of the jurors, sworn falsely in any material respect, his testimony is not to be accepted and acted on without great caution, is not the equivalent of 'mistakenly' and the omission or insertion of the word 'wilfully' before the words 'sworn falsely' would not change the effect of the language in a charge."

To the same effect, see Wood v. State, 48 Ga. 192, 15 Am. Rep. 664, and State v. Smith, 63 Vt. 201, 22 A. 604. The term "false statement" has been frequently interpreted by the federal courts in bankruptcy cases. Under the federal statute it is a bar to a discharge in bankruptcy if the applicant had been guilty of "obtaining money on a materially false statement in writing." In Doyle v. First

National Bank of Baltimore, 231 F. 649 (C. C. A. Md.) the Circuit Court of Appeals for that district held as follows:

"A member of a bankrupt firm, who did not prepare the false statement, and who knew nothing of its contents, and did not know of the falsity of the statement which he did sign, cannot be denied a discharge under Bankr. Act July 1, 1898, c. 541, section 14b, cl. 3, 30 Stat. 550, as amended by Act June 25, 1910, c. 412, section 6, 36 Stat. 839 [11 USCA section 32], entitling him to a discharge, unless he had obtained money on a materially false statement in writing made by him, since 'false' means that which is not true, coupled with a lying intent, and in jurisprudence imports more than the vernacular sense of erroneous or untrue."

It was held to the same effect in In re Rosenfeld (C. C. A.) 262 F. 876. In the latter case the term "false statement" was construed to mean that the "statement must be intentionally false". In the foregoing holding the federal courts are wholly in accord. Fouts v. State, 113 Ohio St. 450, 149 N. E. 551, was a prosecution wherein the defendant was charged with falsely representing himself as a public officer. The question before us was quite fully discussed in that case by the Supreme Court of Ohio as follows:

"The defendant was indicted, not for representing himself to be a police officer, but for falsely representing himself to be a police officer. Now the word 'false' has two distinct and well-recognized meanings: (1) intentionally or knowingly or negligently untrue; (2) untrue by mistake, accident or honestly after the exercise of reasonable care. United States v. Ninety-nine Diamonds, 139 F. 961, 966, 72 C. C. A. 9, 2 L. R. A. (N. S.) 185.

" 'In the more important uses, in jurisprudence, of "false" and "falsely", they usually import somewhat more than the vernacular sense of "erroneous" or "untrue". They are oftenest used to characterize a wrongful or criminal act, such as involves an error or untruth, intentionally or knowingly put forward. A thing is called "false" when it is done, or made, with knowledge, actual or constructive, that it is untrue or illegal, or is said to be done falsely when the meaning is that the party is in fault for its error.' Ratterman, Treasurer, v. Ingalls, 48 Ohio St. 468, 483, 28 N. E. 168, 169; Hatcher v. Dunn, 102 Iowa 411, 71 N. W. 343, 36 L. R. A. 689; Putnam v. Osgood, 51 N. H. 192, 206; State v. Smith, 63 Vt.

201, 22 A. 604; Clapp v. Mass. Benefit Assn., 146 Mass. 519, 16 N. E. 433; Franklin Ins. Co. v. Culver, 6 Ind. 137; Cohn v. Neeves, 40 Wis. 393.

" 'Falsely', as used in an instruction stating that it is for the jury to determine whether defendant falsely represented certain facts, will be construed to mean something more than 'mistakenly' or 'untruly', and cannot be construed otherwise than to mean something designedly untrue or deceitful, and as involving an intention to perpetrate some fraud. State v. Brady, 100 Iowa 191, 204, 69 N. W. 290, 36 L. R. A. 693, 62 Am. St. Rep. 560.

"If the word 'falsely' meant nothing in section 12860, why should it have been used at all? The theory of the trial court seems to be that a mere misrepresentation, even though made in absolute good faith, renders one liable to indictment under this statute. Under that theory of the case the section might well read: Whoever, not a member of a regularly organized police department, a legally elected public official, or commissioned by the proper legal authority, represents himself to be a police officer, sheriff, deputy sheriff, or constable, is liable to fine and imprisonment. The legislature, however, evidently considered that the word 'falsely' has some meaning in this section; that there must have been actual or constructive knowledge of the untruth of the representation, and there must have been the element of actual or constructive deceit present in order to constitute the falsity of the statement. By its use of the word 'falsely' the legislature injected the element of good faith into the crime defined in section 12860."

To put the question in another way, falsity, as distinguished from mistake or accident or inadvertence, implies moral turpitude.

Behind every major crime lies an evil intent to commit it and to inflict resulting injury upon third persons. Indeed, there can be no such crime without intent behind it. The injury attempted may be frustrated and the attempt may fail of its accomplishment. But even so the *attempt* and the *intent* to commit the same may yet remain to be punished by criminal prosecution. In this case the purpose of the alleged fraudulent statement was to invite subscription to preferred stock. In that respect the alleged false statement had no result. The defendant's guilt, if any, must be predicated upon his *intent*. Upon this record the only *incriminating element*, if any, which can be contended for, is the guilty *scienter* and the intent to

deceive. Why then should the defendant not be permitted to show in defense that he believed the statement to be true when he made it, and that he had no intent to deceive?