State of Iowa, appellee, v. Charles N. Elmore, appellant.

No. 48483.

(Reported in 70 N.W.2d 166)

1320

MAY 3, 1955.

REHEARING DENIED SEPTEMBER 23, 1955.

R. E. Killmar, of Osceola, and Hall & Ewalt, of Indianola, for appellant.

Dayton Countryman, Attorney General, Raphael R. R. Dvorak, Assistant Attorney General, John C. Eddy, Special As-

sistant Attorney General, and Phillip F. Elgin, County Attorney, Warren County, for appellee.

MULRONEY, J.—The defendant was indicted for larceny by embezzlement, the indictment charging that "Charles N. Elmore * * * between January 1, 1951 and June 3, 1953 did embezzle and convert to his own use, money that came into his hands by virtue of his office as County Superintendent of Schools, Warren County, Iowa, in the total sum of $1366.70, contrary to the provisions of Section 710.1 of the 1950 Code of Iowa, the same being public money belonging to Warren County, Iowa, and money coming into defendant's hands by virtue of his said office." After plea of not guilty, and trial, the jury returned a verdict of guilty. Under instructions that the jury fix the amount of the embezzlement, in the event they found defendant guilty, in an amount "not to exceed $1366.70", the jury returned a verdict fixing the amount embezzled by defendant at $1055.72.

Many errors are asserted by defendant in his appeal. In general they challenge the correctness of the trial court's rulings on various motions, including motions to direct the verdict for insufficiency of evidence, objections to the introduction of evidence, and the correctness of some of the instructions to the jury.

Charles N. Elmore had been a county school superintendent for seventeen years, coming to Warren County to hold that office in 1945. It appears the office operated partly as a sort of store for the sale of books and supplies to the various school districts and also as a depository for funds received from teachers for teachers' banquets, their membership dues in the teachers' organizations, their magazine subscriptions, insurance premiums collected from pupils, and moving picture film money collected from ten of the districts. In the superintendent's office there were two small boxes, one green and one blue which were used as money boxes for the office receipts. The practice was to deposit all of the funds that came into the office from the sale of books in the green box and periodically the superintendent would take this money to the county treasurer's office and turn it over to the county treasurer. As will appear later this county was operating under the provisions of law (section 273.12, paragraph 4,

and sections 301.15 to 301.23, Code, 1954) giving the county board of education power to purchase books for resale on requisitions which would be paid for by county funds, and the funds turned back to the county when the books were sold.

There is some dispute between the State's testimony and defendant's testimony as to the receipts that were deposited in the blue box. It is undisputed that this box received the money paid in by the teachers for banquets, dues to teachers' organizations, magazine subscriptions, insurance premiums and film money. Portions of the testimony of some of the State's witnesses, who were employees of the office, would seem to indicate part of the receipts from the sale of supplies to the school districts would be placed in the green box and part in the blue box. Other portions of their testimony would indicate the receipts from the sale of supplies all went into the blue box. Defendant testified the practice was to place all of the receipts from the sale of supplies in the blue box. The practice was for the superintendent to take the funds in the blue box periodically to the Peoples Trust and Savings Bank in Indianola where he deposited them in an account in his name as superintendent. In general the checks which the superintendent drew on this account were for the banquet expense, teachers' dues, magazine subscriptions, insurance, and for the purchase of supplies for resale to the school districts. At this point it would be well to pause and examine the law and other evidence with respect to the purchase of supplies for resale and the disposition of receipts thereof.

There is no provision in the law for the county board of education or the school superintendent to purchase supplies with county money, similar to the statutes with respect to the purchase of textbooks. Section 273.13, paragraph 5, Code, 1950, provides the board shall "Purchase and provide such general school supplies, school board supplies, and other materials as are necessary to the conduct of its office."

The record here shows the county board of education, through the superintendent, did purchase supplies on requisitions which were paid by warrants drawn against the board of education fund—not the county fund—as is the case with respect to textbooks. The State's evidence is that some of these supplies were used in the superintendent's office and some were resold to the

school districts. The defendant does not argue that he, or the county board of education for whom he acted, would have the right to purchase supplies for resale under the provisions of the above quoted law. But neither does the State argue he would not. We will not decide the point. Save as it makes for some difficulties as to auditing in this particular case, the point is not very material for in the analysis we will later make we will show defendant's receipts from the sale of all supplies to the school districts were receipts of public money. As will presently appear, the bank account is most important in this case, so it is well to keep in mind its source and general use as shown by the State's evidence. It was made up of deposits of private funds (teachers' payments and the like) and public funds (deposits of all or part of receipts from sale of supplies and the moving picture money paid in by ten districts).

We have given the evidence with respect to the general operation of the office as related by the State's witnesses, but the records of the office are inadequate to reconstruct a statement of all receipts and disbursements showing source and application. To begin with, the State's witnesses, employees of the office, testified there were some cash transactions in the office. Here there would be no record at all, the employee merely placing the cash in the appropriate green or blue box. This will not make any difference because the State's evidence is designed to establish the shortage by the credit transactions of which there was a record. If a record could be reconstructed of the cash transactions it would only increase the shortage.

Actually the only record in the superintendent's office, as shown by the record in this case, showing the purchase of books and supplies by the school districts, consists of the State's Exhibits 15, 16 and 17. These exhibits are three loose-leaf notebooks containing copies of itemized statements sent to the school districts, marked paid, for purchases of books and supplies for the years 1951, 1952 and to June 3, 1953. The State's witness Mrs. Nine, who handled all of these sales, except as she was occasionally helped out by defendant and other employees, and who made up the exhibits, said this was the only record. She also said there was no record at all made of the cash sales. Thus the only record in the superintendent's office of receipts of public money by de-

fendant from January 1, 1951, to June 3, 1953, consists of the payments for books and supplies, purchased only on credit transactions.

What are the records as to what was done with the money? We have the record of the money called "textbook" money or "green box" money that defendant took to the treasurer's office and turned over to the county. We have a record of the checks he drew on the bank account which, as we have seen, contained both public and private money. We have no record of supplies consumed in the operation of his office and no record of supplies purchased but unsold and no inventories of books and supplies in his office on January 1, 1951 or June 3, 1953.

On June 3, 1953, Mr. Paul N. Loomis, a state examiner of accounts under the state auditor's office, made an examination of the foregoing records in the superintendent's office for the period from January 1, 1951 to June 3, 1953. We will discuss his audit later but for the present it is enough to say he found at first a shortage of $642.25. To this figure he added $251.50 which was a check on the aforementioned bank account by defendant for the purchase of a television set. When the defendant admitted this was for his personal use, Mr. Loomis added this to the shortage making it $893.75. Later Mr. Loomis found where defendant had deposited two book refund checks in his private bank account, one for $72 and one for $89.97. He added these to the shortage, making the entire shortage $1055.72—the exact amount the jury found. Here we can state briefly the defendant's explanations of these last items. He said he used the superintendent's bank account to purchase the television set in order to get an "educational discount", intending to put it back (which he did do right after the audit) and the $72 check was inadvertently deposited in his own account when he made an error in making out the deposit slip. He said the check for $89.97 was "bought" by him in the course of making change in the boxes. He said in this regard it was frequently necessary to split up a payment between textbooks and supplies so the proper amount could be placed in each box, and he had often put his own cash in a box for a check so change could be made. He said the State could probably find other transactions similar to the $89.97 check.

There is evidence that after Mr. Loomis completed his audit he brought Exhibits 15, 16 and 17 back to defendant's office and told defendant he was through with them, and after Mr. Loomis had left defendant threw the sheets in an incinerator and brought the notebook covers back to the office and told an office employee to put new sheets in them. The incinerator was not lighted and an employee of his office retrieved the sheets.

I. The first argument that the State's evidence is insufficient to warrant submission of the case to the jury is directed to the essential elements of the crime, as set forth in the statute, and the State's failure to introduce any evidence to prove one or more of those elements.

The indictment is under section 710.1, Code, 1954, describing a special crime of embezzlement called Embezzlement by Public Officers. The statute describes the persons who can commit this offiense as "any state, county, township, school, or municipal officer * * * charged with the collection, safekeeping, transfer, or disbursement of public money * * *."

The punishment for a violation of section 710.1 is fixed by section 710.2, Code, 1950, wherein it is provided "such officer shall be imprisoned in the penitentiary not exceeding ten years" and fined in a sum equal to the amount of money embezzled and forever disqualified from holding any office under the laws of this state.

▆ Defendant's argument is that the legislature has defined a special crime: Embezzlement by Public Officers, carrying a higher degree of punishment than the usual embezzlement, by an agent, and the first essential element for the State to prove was that defendant was a "public officer * * * charged with the collection, safekeeping, transfer, or disbursement of public money * * *." Defendant admits he was a public officer. See section 710.3, Code, 1954; State v. Spaulding, 102 Iowa 639, 72 N.W. 288, and State v. Conway, 219 Iowa 1155, 260 N.W. 88. But defendant argues the void in the State's case is the lack of proof that he was an officer *charged with the safekeeping, transfer or disbursement of public money.* Defendant concedes a county superintendent could be charged with the custody of public money or property by affirmative appropriate action of

the county board of education but here there was no proof introduced by the State that such action was ever taken by the county board of education.

We see no merit in the argument. By section 273.13, Code, 1950, the board is given power to appoint the county superintendent of schools (for a three-year term) and a deputy superintendent, and other clerical help deemed necessary, and fix their salaries. By paragraph 4 of the section the board is to "Adopt textbooks and other instructional aids * * * under the administration of the county superintendent, and purchase, sell, rent or loan them as provided in sections 301.15 to 301.28, inclusive, and serve as a central depository and purchasing agent of such books and instructional aids * * * and make proper accounting for same * * *." The textbook sections, 301.15 to 301.28, referred to in the above quotation are too long to set forth. In general they provide a plan whereby the county board of supervisors pay for textbooks out of county funds, upon requisition of the county board of education and duly attested invoices; the board of education sells them to the school districts and the money collected is to be returned to the county funds after deducting actual expenses authorized by the county board of education. Section 301.21, Code, 1950, provides:

"Unless otherwise ordered by the board of education, the county superintendent shall have charge of such textbooks and of the distribution thereof among the depositories selected by the board; he shall render to the board at each meeting thereof itemized accounts of his doings, and shall be liable on his official bond therefor."

The record shows that during part of the period involved the school board did have one book depository in Indianola and one in Lacona but the superintendent's office was the "central depository." Section 273.13, paragraph 4, supra, and section 301.21, Code, 1950, place the custody of the textbooks in the superintendent "unless otherwise ordered by the board of education." Section 273.18, paragraph 1, provides the superintendent shall act as the "executive officer" of the board. Defendant testified he ordered all textbooks for rural schools; that he knew they were paid for out of county funds; that they were shipped to his office and he received the bills from the publishers;

that he presented the bills to the county auditor in the form of claims to be paid by the county and he said: "I understood that when these books were sold the proceeds from the sale were to be returned to the county funds. That would mean that I would have to deposit the proceeds from the sale of the books with the county treasurer." We deem the evidence, considered in connection with the applicable statutes, sufficient to show the defendant was a public officer charged with the custody and transfer of public property and funds within the provisions of section 710.1, supra. See State v. Conway, 219 Iowa 1155, 260 N.W. 88.

II. Before taking up defendant's further argument with respect to the sufficiency of the evidence we will pass to another asserted error. At the close of the State's case and again at the close of all the testimony the defendant moved that the State be required to elect upon which of the transactions referred to and covered by the evidence it would rely to sustain the charge in the indictment. These motions were overruled.

Section 710.1, Code, 1954, contains four numbered subparagraphs defining the various forms or means by which the public officer can commit the embezzlement. The crime may be committed by failing or refusing to keep the money in the place of custody provided by law (paragraph 1); by keeping the money in any other place than in such place of custody provided by law (paragraph 2); by unlawful conversion to his own use in any way or uses by way of investment or loans without authority of law (paragraph 3); and "converts to his own use any money * * * that may come into his hands by virtue of his office—he shall be guilty of larceny by embezzlement to the amount of so much of said money * * * as is thus taken, converted, invested, used, loaned, or unaccounted for" (paragraph 4).

In the Code of 1939 there was a statute, section 13029, specifically providing that if the officer fails or neglects "to account [for the public money] upon demand of the person entitled thereto, he shall be deemed guilty of embezzlement * * *." This statute was repealed in 1945 by chapter 231, Laws of the Fifty-first General Assembly, and the same session law amended what was then section 13027 in the 1939 Code and now section 710.1 in the 1954 Code by adding to the end of paragraph 4, quoted

above: "and an offer to return and account for, or the actual return and accounting for, such funds or property so embezzled as herein defined shall not relieve such defaulting officer from the crime of larceny by embezzlement or the punishment therefor as fixed in section 13028, Code, 1939" (now section 710.2, Code, 1954).

Defendant's argument that the statute no longer permits embezzlement to be established by a series of acts and a total amount of shortage is based on the repeal of section 13029, supra. The argument is that the only authority that ever existed for establishing embezzlement by a total shortage made up of a series of acts was this section 13029, supra, where it was provided the crime could be committed by failing to account, and when this was repealed in 1945 the crime can no longer be established by a total shortage made up of a series of acts. There is a little support for defendant's argument found in some of the statements in our opinions rendered when section 13029 was a part of the law. See State v. Huff, 217 Iowa 41, 250 N.W. 581, especially the concurring opinion of Justice Stevens, and State v. Berg, 200 Iowa 627, 204 N.W. 441. We feel the repeal must be considered with the amendment. Actually section 13029, supra, was a *failure to account upon demand* statute, which allowed any defaulting officer to pay the shortage, when demanded, and escape prosecution. The repeal and amendment in 1945 removed the necessity for a demand as a part of the foundation for prosecution and specifically provided restitution or accounting would be no defense. The statute, 710.1, paragraph 4, previously quoted, always did contain the words "or unaccounted for." There was a time, before section 13029, supra, was enacted, when we held "*or* unaccounted for" meant "*and* unaccounted for." See State v. Brandt, 41 Iowa 593. The effect of the amendment in 1945, making restitution, or *accounting* for, no defense, is to restore the word "or" to its disjunctive meaning.

The State resisted the motions to require it to elect and contended the crime could be established by proof of a total shortage revealed by an audit. The ruling of the trial court sustained the State's theory and we hold the ruling was correct. The indictment was drawn on the theory of a total shortage for

a definite period of time, and when the case was submitted to the jury it was on the State's theory of a total shortage for that period, without any reference to the individual check transactions where the defendant purchased the television set, or deposited book refund checks in his own account. They merely became items in an over-all shortage. See 23 C. J. S., Criminal Law, section 1044(5).

III. Going back now to the assigned error that the evidence was insufficient we take up the second argument by defendant which is that the State's evidence did not permit the finding of a shortage. With this we will discuss the testimony of Mr. Loomis, his audit, and its admission in evidence, which is the subject of another assigned error. When the audit, which was Exhibit S-18, was first introduced by the State the objection was sustained, thereafter certain deletions were made in the audit and it was again offered and the defendant made a long objection including the grounds of hearsay, and the fact that it included figures and calculations not supported by the record. The court admitted the audit for a limited purpose, the court stating: "Mr. Reporter, let the record show that Exhibit S-18 is admitted into evidence for the sole purpose of aiding the jury, if it does, to understand the testimony of the witness, Paul Loomis, who testified as to the matters set forth therein. It is not itself substantive evidence; the jury is to determine the facts from other evidence in the case, and the Exhibit S-18 is to be considered for no other purpose than for aiding them, if it does, to understand the other evidence in the case."

In instruction 10 the court referred to the audit, Exhibit S-18, and again warned the jury it was not substantive proof and limited its use in practically the same language he used when admitting the exhibit. The importance of this exhibit is manifest when it is seen the jury found the exact shortage stated in the audit plus the $89.97 check which was not known at the time of the audit.

At the outset it is well to observe the defendant cannot be found guilty merely because he kept the affairs of his office in a slipshod and unbusinesslike manner. It seems almost incredible that in this day of modern accounting methods and machines the public money would be handled in the manner re-

vealed by this record. But defendant can only be found guilty upon the State's evidence that he converted public money to his own use, to be established by proof that a total shortage existed—in short, that the amount of public money he received during a certain period is more than the amount of public money he turned over, plus legitimate expenditures, and plus the balance on hand.

We are persuaded to the view that the State is right in charging the defendant with the receipt of public money on all receipts for the sale of supplies because defendant received no private money for the purchase of supplies at retail. The private money he received from the teachers and insurance premiums was merely deposited and checked out. It afforded no operating capital for the extensive school supply business that defendant carried on since 1951. We do not know when this school supply business started but the record shows it existed prior to 1951, and the bankbook shows the bank account was in existence in 1945. The receipts of public money that defendant would be charged with would be public money due the county general fund for the sale of textbooks, and public money due the board of education fund for the sale of supplies, and the moving picture money. It was all public money and the State made no effort to separate his receipts into public money belonging to the county general fund and public money belonging to the board of education fund. There is this difference which at least the State does not challenge: he could spend the board of education funds for the purchase of more supplies for resale. There are a few instances where he spent board of education funds in the bank account for books but this would merely mean it would be credited to the wrong county fund and the State admits this would not result in any shortage.

The moving picture money requires some further explanation. The record shows ten school districts paid $40 a year each into the defendant's office. This was deposited in the blue box and in the bank account and checked out for the purchase of films and expenses of the movie camera, and for the purpose of purchasing a new camera about every two years with the old as a trade-in. The payments that were made by the ten school districts were items in their statements along with books and

supplies. In Exhibits 15, 16 and 17 the movie payments for these ten schools for two years, or $800, are included. This money would be public money and money that came into defendant's hands by virtue of his office.

The State's evidence was designed to show the embezzlement by showing all of the public money he received during the period of January 1, 1951 to June 3, 1953, the amount he turned over to the treasurer, the amount of public money he deposited in the bank account less the amount he expended legitimately (all but the television check for $251.50) and the difference should be the balance he should have on hand—and the State claims this showed a shortage of $1055.72.

Obviously the first figure to secure is the total sum of public money he received. The credit transactions with the various school districts were the only available records. These are all in Exhibits 15, 16 and 17. The statements show the school districts purchased both books and supplies, and ten districts paid in their film money. We have totaled the statements and they amount to $3526.57, and this includes $800 movie money paid by the ten districts. Mr. Loomis testified: "Referring to the statement of collections of accounts that came through Exhibits 15, 16 and 17, the total of those collections was $3837.11." That is the figure Mr. Loomis arrived at as shown by his itemized audit comprising five sheets of the audit. But it is obvious Mr. Loomis has included more items than appear in Exhibits 15, 16 and 17. We have checked the five sheets of his audit with the statements that appear in Exhibits 15, 16 and 17 and we find 67 items of payments, evidently by schoolteachers, which we do not find in Exhibits 15, 16 and 17. There is no testimony by any witness concerning these items. If Mr. Loomis found some record in the superintendent's office showing these 67 items he did not testify about it. In view of the firm evidence that Exhibits 15, 16 and 17 contain, as Mr. Loomis said, the only record, we feel the jury could only use the figure $3526.57 when charging the defendant with receipt of public funds from January 1, 1951 to June 3, 1953. Since, as we will presently point out, the other figures in Mr. Loomis's audit could be accepted, this would reduce the shortage by the sum of $310.74.

Two other items need to be added to the figure $3526.57. They are the two book refund checks of $72 and $89.97, deposited in defendant's personal account. The jury had a right to disregard defendant's explanation as to these items. This makes a total of $3688.54 which is the most the jury could find of public money received by defendant from January 1, 1951 to June 3, 1953.

We mean no criticism of Mr. Loomis and our saying his figure of public money received ($3837.11) cannot be accepted does not mean we doubt the correctness of his audit. It is just that here Exhibits 15, 16 and 17 must control, and it is apparent some pages or records were lost out of those notebooks, maybe when they were thrown in the incinerator. At any rate we have checked those exhibits carefully and the 67 items of teachers' payments are not in them.

Mr. Loomis starts with a balance in the account on January 1, 1951 of $380.95 which he stated he got from the "bank statement, this Peoples Trust and Savings Bank * * * this bank statement and cancelled checks marked Exhibit 8, I had those and examined them as a part of this examination." The trial court sustained defendant's objection to the admission of Exhibit 8. Mr. Loomis had the task of separating the deposits in the bank account into public and private funds. This he does by listing the checks that were given for magazine subscriptions, banquets and insurance and terming them "outside collections." This means he assumes the defendant made outside collections of private funds and deposited such funds in the bank to cover these checks. This method is justified by the record and about the only way one could separate the deposits into deposits of public and private funds. The defendant admitted he did deposit private funds to cover the checks listed by Mr. Loomis as "outside collections."

■ The argument advanced by defendant that Mr. Loomis's audit was not admissible is that there is no proof of the beginning bank balance of $380.95 and the portion of the audit that is taken from the check stubs to show the "outside collections" is not substantiated by other proof, because the court sustained defendant's objections to the admission of the checkbook (Exhibit 10).

It is apparent the record of the bank account and the checkbook were in the courtroom and available to defendant for checking. Indeed the checkbook was certified here, although defendant is right when he states the record shows it was not admitted. Mr. Loomis testified at length as to how he secured the figures in his audit and defendant had ample opportunity to cross-examine him. Everything else in his audit was substantiated by other evidence. And in fact Mr. Loomis testified he discussed the audit with defendant and he admitted he had received private funds to cover the "outside collection" items which were taken from the check stubs. We think there was no error in admitting the audit even though defendant was successful in blocking the admission of some documents that were used as a source for some of the figures contained therein.

The argument advanced by the State in answer to defendant's argument is the contention that the audit was admissible in evidence without any restrictions and defendant received a more favorable ruling than he was entitled to when the court told the jury the audit was not to be considered as substantive proof. The State cites State v. Dobry, 217 Iowa 858, 250 N.W. 702; State v. Niehaus, 209 Iowa 533, 228 N.W. 308; State v. Brady, 100 Iowa 191, 69 N.W. 290, 36 L. R. A. 693, 62 Am. St. Rep. 560; State v. Cadwell, 79 Iowa 432, 44 N.W. 700, and 2 Wigmore on Evidence, section 1230.

It is true that in the cited cases where somewhat similar audits were held admissible they were usually supported by primary evidence—they were no more than tabulations of figures appearing in books and records admitted in evidence. But there is authority that the audit of a qualified accountant is admissible when it reflects the condition of an office as shown by books and records which are in court and made available to opposing counsel, and the latter is afforded full opportunity to cross-examine the maker of the audit. Casselman v. State, 58 Okla. Cr. 371, 54 P.2d 678; Buckley v. State, 131 Neb. 752, 269 N.W. 892. Usually this is done where the records are voluminous and the audit is the result of an examination of books, records and entries that are in the courtroom subject to inspection by accused. Here the bank account record was not very voluminous and it probably should have been admitted, at least to show the beginning and

ending balances. But the records were in the courtroom and defendant had full opportunity to cross-examine the auditor. This was defendant's own bank account as superintendent in which he alone made deposits and withdrawals. The auditor testified the bank account was in balance and only one check, for the purchase of the television set ($251.50), was assailed as improper. Under the special facts of this case we hold there was no error in admitting Exhibit S-18 and the evidence was sufficient to show the crime of embezzlement was committed, though in an amount somewhat less than the audit shows.

IV. The defendant complains as to the admission of testimony of the county auditor showing the gross amount of expenditures for textbooks during the period in question. The evidence should not have been admitted since the receipts from the sale of all textbooks were not chargeable to defendant. But all of the State's evidence showed this fact and we do not believe any prejudice resulted. The State's case was based purely on a cash audit, without any inventories, and it is apparent the jury understood this. In effect the State's case is that all the public money that came into defendant's office never reached the treasurer or the office bank account, and one withdrawal from the office bank account for the television set ($251.50) was illegal.

V. Defendant argues the trial court erred in admitting in evidence the check for $251.50 used by the defendant to buy a television set for his personal use. The argument is that the evidence fails to show it was paid out of public funds. It was paid out of the office bank account and the evidence shows quite convincingly that even without this item the bank account was short of public money that should have been deposited there. While it is true the defendant had both private and public money in the bank account, and the State had the burden here of proving a shortage of public money, the defendant was given credit for all deposits of private money that could be reconstructed. When the balance remaining was still not equal to the public money the records show he received, an unauthorized withdrawal of even part of that balance is evidence of converting public money.

VI. The defendant argues the court erred in admitting the two book refund checks defendant deposited in his private

account. The argument is the evidence failed to show the checks were converted into money. They were items of county receipts and depositing them in his personal account made a prima-facie case of embezzlement. State v. Davidson, 242 Wis. 406, 8 N.W.2d 275, 145 A. L. R. 1411.

VII. Defendant's exception to instruction 7 which dealt with impeachment was that it unduly stressed the purpose of certain testimony and, combined with instructions 5 and 6, it led the jury to believe defendant was impeached. Defendant also excepted to instruction 7 on the ground it should have been limited to contradictions of material facts. In the brief in this court defendant argues the instruction was wrong because it makes a general statement "a witness's testimony may be impeached" instead of saying it would be the witness who would be impeached. This was not a ground of the exception. It is true impeachment is accomplished by contradictory statements material to the issue but we do not see any reversible error here and defendant does not point to any evidence of contradictory statements that would not be material. Instruction 7 must be read with instructions 5 and 6, which latter instructions caution the jury about the weight to be given testimony of previous verbal statements and admissions. They are not unfavorable to defendant.

VIII. Defendant objects to the instruction calling Mr. Loomis an expert witness. The instruction warns the jury they are not required to surrender their judgment to any person testifying as an expert. There is authority for calling such an accountant an expert. State v. Cadwell, 79 Iowa 432, 44 N.W. 700; United States v. Deardorff, 40 F. Supp. 512. It is doubtful whether Mr. Loomis was an expert, stating his opinion, in this case. He was testifying from data and he merely gave his calculations, but we do not feel calling him an expert and warning the jury they did not have to accept his opinion was prejudicial.

IX. The court had to submit to the jury the question of amount of the embezzlement. We do not think the court should have stated the maximum as the amount stated in the indictment but no reversible error occurred for this finding does not determine the crime or the degree. It goes only to the pun-

1336

ishment. In the instant case we will reduce this finding by the sum of $310.74, for the evidence does not support Mr. Loomis's 67 items in Exhibits 15, 16 and 17. See State v. Barlow, 242 Iowa 714, 46 N.W.2d 725; State v. Finnegan, 244 Iowa 166, 55 N.W.2d 223. This will reduce the mandatory fine to $744.98.

We have disposed of nearly all of the asserted assignments of error and we have examined those not mentioned herein. There is no merit in any of them. With the reduction in the fine, above noted, the cause is affirmed.—Affirmed.

All JUSTICES concur.